CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY V. STATE OF NEBRASKA, EX REL. CITY OF OMAHA.

FILED MARCH 18, 1896.   No. 7805.

1. **Police Power.**   The essential quality of the police power as a governmental agency is that it imposes upon persons and property burdens designed to promote the safety and welfare of the public at large.

2. ———.   The legislature cannot, under the guise of police regulations, arbitrarily invade personal rights or private property.   There must be some obvious and real connec-

tion between the actual provisions of such measures and
their assumed purpose.

3. Constitutional Law: PROPERTY RIGHTS: PUBLIC USE: DUE
PROCESS OF LAW. "Due process of law," as the term is
used in the state and federal constitutions, does not nec-
essarily imply a hearing, by one whose property is taken
or damaged for public use, according to the established
practice in courts of common law or equity, but is satis-
fied whenever an opportunity is afforded to invoke the
equal protection of the law by judicial proceedings ap-
propriate for the purpose and adequate to secure the
end and object sought to be attained.

4. Legislature: PUBLIC WELFARE: CONTRACTS. The power of
the legislature to subserve the general welfare of the
people by all needful and proper regulations in the in-
terest of health and safety, is inherent in the sover-
eignty of the state and cannot be bartered away by
contract or otherwise.

5. Municipal Corporations: POLICE POWER. Such power may
be asserted directly by the legislature, or may, in the ab-
sence of constitutional restrictions upon the subject, be
delegated to the several municipal corporations or other
agencies provided for its exercise.

6. Statutes: PROPERTY RIGHTS: COURTS. The power of the
legislature over private property is not absolute. But
while it cannot at will impose upon property burdens
so excessive and unreasonable as to work a practical
confiscation thereof, the courts will never interfere to
prevent the enforcement of statutes on account of any
mere difference of opinion between them and the law-
making power of the government respecting the wisdom
or necessity of particular measures.

7. Municipal Corporations: RAILROAD COMPANIES: VIA-
DUCTS: REPAIR. The provision of the charter of the
city of Omaha (Compiled Statutes, ch. 12a, sec. 48), au-
thorizing said city, by ordinance, to require railroad
companies to construct and keep in repair viaducts over
streets therein, crossed by their tracks, is a valid exer-
cise of the police power of the state.

8. City Ordinances: RAILROAD COMPANIES: VIADUCTS: CON-
TRACTS. Ordinance requiring the reconstruction by two
railroad companies of specific portions of a viaduct pre-
viously erected by them jointly with the city, *held*, not
to violate prior contract obligations.

9. ———: ———: ———: REPAIRS: PARTIES. Nor is such ordinance void as against the railroad companies therein named as the owners of said roads for the failure of the city to proceed against other companies engaged in operating one or more of said tracks as lessees of the owners, the charter obligation being imposed upon railroad companies owning or operating separate lines of track.

10. Mandamus: RAILROAD COMPANIES. The duty of railroad companies to construct or repair viaducts within the city of Omaha may be enforced by writ of *mandamus*.

ERROR from the district court of Douglas county. Tried below before AMBROSE, J.

The opinion contains a statement of the case.

*C. J. Greene*, for plaintiff in error:

The provisions of section 48 of the city charter do not apply to viaducts existing at the time they went into operation, but to those only to be thereafter constructed. (*Chew Heong v. United States*, 112 U. S., 559; *State v. Stein*, 13 Neb., 530; *Bartruff v. Remey*, 15 Ia., 257; *McIntosh v. Kilbourne*, 37 Ia., 420; 2 Dillon, Municipal Corporations, sec. 1018; *City of Lincoln v. Walker*, 18 Neb., 244; *City of Plattsmouth v. Mitchell*, 20 Neb., 228; *Foxworthy v. City of Hastings*, 25 Neb., 133; *City of Lincoln v. Smith*, 28 Neb., 762; *Kinney v. City of Tekamah*, 30 Neb., 605; *City of Omaha v. Randolph*, 30 Neb., 699; *Watson v. Tripp*, 11 R. I., 98.)

The provisions of the ordinance authorize the taking of respondent's property without due process of law and also impair the obligations of the contracts under which the respondent's track was located and the viaduct constructed. (*Edwards v. Kearzey*, 96 U. S., 595; *New Orleans Gas Light Co. v. Louisiana Light Co.*, 115 U. S., 650; *Slaughter*

*House Cases*, 16 Wall. [U. S.], 62; *Stone v. Missis-sippi*, 101 U. S., 814; *Bridge Proprietors v. Hoboken Co.*, 1 Wall. [U. S.], 116; *The Binghampton Bridge*, 3 Wall. [U. S.], 51; *West River Bridge Co. v. Dix*, 6 How. [U. S.], 531; *Pontchartrain R. Co. v. Orleans Navigation Co.*, 15 La., 413; *Crescent City Gaslight Co. v. New Orleans Gaslight Co.*, 27 La. Ann., 147; *St. Anna's Asylum v. City of New Orleans*, 105 U. S., 368; *Home of the Friendless v. Rouse*, 8 Wall. [U. S.], 430; *New Jersey v. Wilson*, 7 Cranch [U. S.], 166; *State Bank of Ohio v. Knoop*, 16 How. [U. S.], 376; *Gordon v. Appeal Tax Court*, 3 How. [U. S.], 133; *Wilmington & R. R. Co. v. Reid*, 13 Wall. [U. S.], 266; *Humphrey v. Pegues*, 16 Wall. [U. S.], 248; *Farrington v. Tennessee*, 95 U. S., 689; *Ohio Life Ins. & Trust Co. v. Debolt*, 16 How. [U. S.], 428; *Ward v. Farwell*, 97 Ill., 593; *Coast Line R. Co. v. City of Savannah*, 30 Fed. Rep., 646; *State v. Corrigan Consolidated Street R. Co.*, 85 Mo., 263; *Illinois C. R. Co. v. City of Bloomington*, 76 Ill., 447; *Sioux City Street R. Co. v. Sioux City*, 138 U. S., 98; *Peck v. Chicago & N. W. R. Co.*, 94 U. S., 164; *Boston Beer Co. v. Massachusetts*, 97 U. S., 25; *Northwestern Fertilizing Co. v. Hyde Park*, 97 U. S., 663; *Butchers' Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co.*, 111 U. S., 746.)

The respondent is under no legal duty to make the repairs in question, for the reason that in the proceedings of its council to impose such duty or obligation the relator has failed to observe the requirements of section 48 of the city charter.

If the act under consideration can be justified, it must be as an exercise of that power which abides with the state to be used when necessary to secure the public safety. (*County of Santa Clara*

*v. Southern P. R. Co.*, 18 Fed. Rep., 392; *Newland v. Marsh*, 19 Ill., 376; *Bigelow v. West Wisconsin R. Co.*, 27 Wis., 478; *Dow v. Norris*, 4 N. H., 16; *City of Dubuque v. Illinois C. R. Co.*, 39 Ia., 56; *People v. Supervisors of Orange County*, 17 N. Y., 235; *Boisdere v. Citizens Bank*, 29 Am. Dec. [La.], 453.)

A hearing, or an opportunity for one, is essential to the validity of the act and the proceedings under it. (*Hagar v. Reclamation District*, 111 U. S., 701; *Barhyte v. Shepherd*, 35 N. Y., 238; *Hassan v. City of Rochester*, 67 N. Y., 528; *Stuart v. Palmer*, 74 N. Y., 183; *Williams v. Weaver*, 75 N. Y., 30; *Jordon v. Hyatt*, 3 Barb. [N. Y.], 275; *Ireland v. City of Rochester*, 51 Barb. [N. Y.], 416; *State v. City of Jersey City*, 24 N. J. Law, 662; *State v. Town of Morristown*, 34 N. J. Law, 445; *Griffin v. Mixon*, 38 Miss., 434; *Overing v. Foote*, 65 N. Y., 269; *Thomas v. Gain*, 35 Mich., 155; *State v. City of Plainfield*, 38 N. J. Law, 97; *Patten v. Green*, 13 Cal., 325; *San Mateo County v. Southern P. R. Co.*, 8 Sawy. [U. S. C. C.], 238; *Darling v. Gunn*, 50 Ill., 424; *Gatch v. City of Des Moines*, 63 Ia., 718; *Trustees v. City of Davenport*, 65 Ia., 633; *Ulman v. Mayor of City of Baltimore*, 21 Atl. Rep. [Md.], 711; *Boorman v. City of Santa Barbara*, 4 Pac. Rep., [Cal.], 31; *Campbell v. Dwiggins*, 83 Ind., 473; *State v. Mayor of City of Newark*, 25 N. J. Law, 399; *City of St. Louis v. Hill*, 22 S. W. Rep. [Mo.], 861; *Bradley v. Fallbrook Irrigation District*, 68 Fed. Rep., 948; *McMillen v. Anderson*, 95 U. S., 37; *Davidson v. Board of Administrators of New Orleans*, 96 U. S., 97.)

Notice must be given to persons interested. (*Hess v. Cole*, 3 Zab. [N. J.], 116; *Coster v. New Jersey Railroad & Transportation Co.*, 3 Zab. [N. J.], 227; *Vail v. Morris & E. R. Co.*, 1 Zab. [N. J.], 191;

*In re Flatbush Avenue,* 1 Barb. [N. Y.], 286; *Owners of Ground v. Mayor of City of Albany,* 15 Wend. [N. Y.], 374; *Vantilburgh v. Shann,* 4 Zab. [N. J.], 740; *Kirby v. Shaw,* 19 Pa. St., 258; *Schenley v. Commonwealth,* 36 Pa. St., 29; *McGonigle v. Alleghany City,* 44 Pa. St., 118; *In re Washington Avenue,* 69 Pa. St., 360; *City of Paterson v. Society for Establishing Useful Manufactures,* 24 N. J. Law, 385; *Tide-water Co. v. Coster,* 18 N. J. Eq., 519; *In re Drainage of Lands,* 35 N. J. Law, 497; *St. John v. City of East St. Louis,* 50 Ill., 92; *In re Albany Street,* 11 Wend. [N. Y.], 149; *Litchfield v. Vernon,* 41 N. Y., 123; *Brady v. King,* 53 Cal., 45; *Taylor v. Palmer,* 31 Cal., 240.)

Conceding that the respondent is under a legal duty or obligation to make the repairs, there is no statute, either special or general, conferring upon the courts authority to compel the discharge of such duty or obligation by writ of *mandamus.* (*State v. Grand Island & W. C. R. Co.,* 27 Neb., 694; *State v. Chicago, B. & Q. R. Co.,* 29 Neb., 412; *State v. St. Paul, M. & M. R. Co.,* 35 Minn., 131, 38 Minn., 246; *State v. Minneapolis & St. L. R. Co.,* 39 Minn., 219; *Trumble v. Trumble,* 37 Neb., 346; *State v. Smith,* 35 Minn., 257; *Gaal v. Townsend,* 77 Tex., 464; *Lyon v. Rice,* 41 Conn., 245; *State v. Jones,* 1 Ired. Law [N. Car.], 129; *Knight v. Ferris,* 6 Houst. [Del.], 283.)

*J. W. Deweese,* also for plaintiff in error.

*W. J. Connell, contra:*

The remedy by *mandamus* is given by section 645 of the Code "to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station."

Railroad companies hold "trust or station" within the meaning of the Code. (*State v. Chicago, B. & Q. R. Co.*, 29 Neb., 412; *State v. Grand Island & W. C. R. Co.*, 27 Neb., 694, 31 Neb., 213; *State v. Missouri P. R. Co.*, 5 Pac. Rep. [Kan.], 772; 14 Am. & Eng. Ency. of Law, 158.)

The remedy was especially conferred in this class of cases by charter provision, and the act is valid. (*Dogge v. State*, 17 Neb., 140; *State v. Babcock*, 23 Neb., 130; *State v. Berka*, 20 Neb., 375; *In re White*, 33 Neb., 813; *Smails v. White*, 4 Neb., 353; *State v. Arnold*, 31 Neb., 75; *Smith v. State*, 34 Neb., 691.)

The relator has a clear legal right to be enforced. (*State v. Missouri P. R. Co.*, 5 Pac. Rep. [Kan.], 772; *Hagar v. Reclamation District*, 111 U. S., 701; *State v. Stearns*, 11 Neb., 104; *Indianapolis & C. R. Co. v. State*, 37 Ind., 489; *Habersham v. Savannah & Ogechee Canal Co.*, 26 Ga., 665.)

POST, C. J.

This was a proceeding on the relation of the city of Omaha to require the Chicago, Burlington & Quincy Railroad Company, hereafter referred to as the "respondents," to repair the south one-third of the so-called Eleventh street viaduct, in said city. There was a trial upon issues joined in the district court for Douglas county, resulting in a finding and judgment in accordance with the prayer of the relator, and which has, by appropriate proceedings, been removed into this court for review.

It is essential to a perfect understanding of the questions discussed to refer in detail to the legislation of the state and the city so far as it relates to the subject of the controversy, and in so doing

we will follow the order in which they are presented in the valuable brief submitted in behalf of the respondent.

In the year 1869 the Omaha & Southwestern Railroad Company was organized under the general statutes of this state, and immediately thereafter constructed a line of road from the city of Omaha, in a southwesterly direction, to a point on the Platte river in Sarpy county, and which it continued to operate until the year 1871, when it transferred all of its property and franchises to the Burlington & Missouri River Railroad Company, also a Nebraska corporation, by lease for 999 years. Said road was by the last named company operated until 1880, in which year it was, together with all the property and franchises of the original corporation, transferred to the respondent company, a corporation of the state of Illinois. Section 83, chapter 25, Revised Statutes, 1866, under which the Omaha & Southwestern Compnay was organized, contained among other provisions the following:

"Sec. 83. If it shall be necessary in the location of any part of any railroad to occupy any road, street, alley, or public way or ground of any kind, or any part thereof, it shall be competent for the municipal or other corporation or public officer or public authority owning or having charge thereof and the railroad company to agree upon the manner and upon the terms and conditions upon which the same may be used or occupied."

In the year 1884 application was by the last named company made to the city for permission to lay its tracks over and across certain streets therein, including Eleventh street; and in response to that request an ordinance, No. 729,

was enacted and approved in the following language:

"Said Omaha & Southwestern Railroad Company shall have the right to construct, maintain, and operate a line of railroad along, upon, through, and across said portion of said streets and alleys as a part of its line; *Provided*, That said railroad track and tracks are constructed so as to conform to the grade of said streets as near as may be, and so as to interfere as little as possible with the travel along and upon said streets; *And provided*, That nothing herein contained shall be construed as interfering with the right of any property owner to recover from said company any damages resulting to private property by reason of the construction of said railroad, and nothing herein granted shall authorize any interference with the tracks of the Union Pacific Railway Company, now laid and operated by said Union Pacific Railway Company, in any portion of the streets and alleys herein named and enumerated."

Pursuant to said ordinance the respondent soon thereafter constructed a track from Tenth street across Eleventh street, and thence in a southwesterly direction to the city limits. Long previous to the last mentioned date the Union Pacific Railway Company had, with the consent of the city, constructed twenty-one or more tracks across Eleventh street, which have ever since been in continual operation for general traffic and for switching purposes, so that the additional tracks therein of the respondent did not materially increase the inconvenience or danger of the public in the use of said street.

By sections 1, 2, and 4 of an act entitled "An act to provide for viaducts, bridges, and tunnels, in

certain cases, in cities of the first class," approved
March 4, 1885 (Session Laws, 1885, p. 109, ch. 12),
it was declared:

"Section 1. That the mayor and city council in
any city of the first class shall have power, when-
ever they deem any improvement, herein provided
for, necessary for the safety and convenience of
the public, to engage and aid in the construction
of any viaduct or bridge over, or tunnel under
any railroad track or tracks, switch or switches in
such cities, when such track or switches cross or
occupy any street, alley, or highway thereof, in the
manner and to the extent hereinafter provided.

"Sec. 2. Whenever any such viaduct, bridge, or
tunnel shall be deemed necessary, as provided in
the preceding section, the mayor and city council
shall have the power to secure and adopt plans
and specifications therefor, together with the esti-
mated cost of the work, and thereupon, if the rail-
road company or companies across whose tracks
or switches the work is proposed to be built, will
assume three-fifths (3-5) of the entire cost thereof,
and three-fifths (3-5) of all damages to abutting
property on account of construction of said via-
duct, bridge, or tunnel, and secure to the city the
payment of the necessary funds to meet it as the
work progresses, in such manner and with such
security as the mayor and city council shall re-
quire, and when the payment of the further sum.
of one-fifth (1-5) of the money required for said
improvement is arranged for in manner satisfac-
tory to said mayor and council, either by private
donation or by execution of good and sufficient
bond as will protect said city from the payment
of said one-fifth (1-5), then the said mayor and
council may proceed to contract with the neces-

sary party or parties for the construction of such viaduct, bridge, or tunnel, under the supervision of the board of public works of such city, and to provide for the payment of one-fifth (1-5) of the cost thereof by the city, by special tax on all taxable property in such city, and one-fifth (1-5) by special tax to property benefitted, as provided in the following section, if not otherwise provided for.

"Sec. 4. The city, with the assent of the railroad company or companies aiding in the construction of any such viaduct, bridge, or tunnel as herein provided, may permit any street railway company to build its street railway track and operate its railway upon or through the same, upon such terms and conditions and for such compensation as shall be agreed upon between the city and the street railway company. And the compensation paid for such use shall be set apart and used towards the maintenance of such viaduct, bridge, or tunnel."

In virtue of the foregoing provisions the city, the Union Pacific Company, and the respondent, in the year 1886, entered into an agreement in writing, the essential part of which is as follows:

*    *    *    "Witnesseth, that the said parties of the second part, in pursuance of the provisions of an act of the legislature of the state of Nebraska, entitled 'An act to provide for viaducts, bridges, and tunnels in certain cases in cities of the first class,' do hereby assume and agree to pay, as may be required by the mayor and city council of said city, three-fifths of the entire cost of constructing a viaduct along Eleventh street in said city over the railroad tracks of said parties of the second part, and three-fifths of the damages to abutting

property on account of the construction of such viaduct, not otherwise provided for by waivers or private contributions, such entire cost and damages not to exceed the sum of ninety thousand dollars ($90,000), the amount so assumed and agreed to be paid being three-fifths of the entire cost and damages, to be proportioned between said parties of the second part as follows: Three-fourths thereof to be paid by said Union Pacific Railway Company and one-fourth thereof to be paid by said Omaha & Southwestern Railroad Company. * * *

"The plans and specifications for said viaducts, before contracts for the construction thereof are entered into, shall be submitted to and approved by said parties of the second part, and should plans and specifications be adopted by said party of the first part, and approved by said party of the second part, which shall increase the said cost and damages beyond the amounts herein limited, then the said parties of the second part are to pay their respective proportions of such increased cost and damages, in the same manner and according to the same division as hereinbefore agreed." * * *

Pursuant to that agreement the viaduct in question was constructed and dedicated to the use of the public early in the year 1887. In the year last named a new charter was provided for the city by an act entitled "An act incorporating metropolitan cities and defining and prescribing their duties, powers, and government" (Session Laws, 1887, p. 105, ch. 10), section 48 of which, as amended in 1893, reads as follows:

"Sec. 48. The mayor and council shall have power to require any railway company or com-

panies owning or operating any railway tracks upon or across any public street or streets of the city to erect, construct, reconstruct, complete and keep in repair any viaduct or viaducts upon or along such street or streets and over or under such track or tracks, including the approaches to such viaduct or viaducts, as may be deemed and declared by the mayor and council necessary for the safety and protection of the public.  *  *  * When two or more railroad companies own or operate separate lines of track to be crossed by any such viaduct, the proportion thereof, and of the approaches thereto, to be constructed by each, or the cost to be borne by each, shall be determined by the mayor and council.  It shall be the duty of any railroad company or companies upon being required as herein provided to erect, construct, reconstruct, or repair any viaduct, to proceed, within the time and in the manner required by the mayor and council, to erect, construct, reconstruct, or repair the same, and it shall be a misdemeanor for any railroad company or companies to fail, neglect, or refuse to perform such duty, and upon conviction such company or companies shall be fined one hundred dollars ($100), and each day any such company or companies shall fail, neglect, or refuse to perform such duty shall be deemed and held to be a separate and distinct offense, and in addition to the penalty herein provided any such company or companies shall be compelled by *mandamus* or other appropriate proceedings to erect, construct, reconstruct, or repair any viaduct as may be required by ordinance as herein provided.  The mayor and council shall also have power, whenever any railroad company or companies shall fail, neglect, or

refuse to erect, construct, reconstruct, or repair
any viaduct or viaducts after having been re-
quired so to do as herein provided, to proceed
with the erection, construction, reconstruction,
or repair of such viaduct or viaducts by contract
or in such other manner as may be provided by
ordinance,. and assess the costs of the erection,
construction, reconstruction, or repair of such via-
duct or viaducts against the property of the rail-
road company or companies required to erect,
construct, reconstruct, or repair the same, and
such cost shall be a valid and subsisting lien
against such property and shall also be a legal
indebtedness of said company or companies in
favor of such city, and may be enforced and col-
lected by suit in the proper court." (Session Laws,
1893, p. 70, ch. 3, sec. 7.)

In the month of January, 1894, the relator, hav-
ing determined from the report of the city engi-
neer, the board of public works, and other com-
petent evidence that extensive repairs were re-
quired upon said viaduct by reason of structural
weakness thereof and other causes, enacted an or-
dinance approving the plans and specifications
therefor previously submitted by the city engi-
neer, sections 2 and 3 of which read as follows:

"Sec. 2. That the Union Pacific Railway Com-
pany be and is hereby, ordered, directed, and re-
quired to repair that portion of said Eleventh
street viaduct from the north end of said viaduct
south for a distance of two-thirds of the entire
length of said viaduct, and the Chicago, Burling-
ton & Quincy Railroad Company, grantee and suc-
cessor to the Burlington & Missouri River Rail-
road Company in Nebraska and the Omaha &
Southwestern Railroad Company, be and is

hereby ordered, directed, and required to repair that portion of said Eleventh street viaduct commencing at the south end thereof and extending northward a distance of one-third of the entire length of said viaduct; the said repairs to be made in accordance with said plans and specifications and to be done under the supervision of the city engineer; the said repairs to be commenced without unnecessary delay and fully completed as herein required within ninety days from the passage and approval of this ordinance.

"Sec. 3. That the city clerk be and is hereby directed to furnish to said Union Pacific Railway Company and to said Chicago, Burlington & Quincy Railroad Company, owning or operating railroad tracks upon and across said Eleventh street under said Eleventh street viaduct, a duly certified copy of this ordinance without unnecessary delay, and that the city engineer is hereby directed to furnish to each of said railroad companies a copy of said plans and specifications, and to superintend the work of making said repairs."

Notice of the foregoing order was in due form served upon the respondent as well as upon the Union Pacific Railway Company, and upon the refusal of the former to comply with the terms of the ordinance this proceeding was instituted, with the result stated.

The first proposition asserted by the respondent is that section 48, above set out, has a prospective operation only, and does not in terms or by implication apply to viaducts in existence at the time it took effect. We are, however, unable to accept counsel's definition of a retrospective law. A statute does not operate retroactively from the mere fact that it relates to antecedent events. A

retrospective law has been defined as one in-
tended to affect transactions which occurred, or
rights which accrued, before it became operative
as such, and which ascribes to them effects not
inherent in their nature in view of the law in
force at the time of their occurrence. (Bishop,
Written Laws, sec. 83; Black, Interpretation of
Laws, p. 247.) The language employed in the
statute is "any viaduct or viaducts," and must,
when read in the light of the authorities cited,
be held to include such as were then in existence
as well as those subsequently constructed.

The essential quality of the police power as a
governmental agency is that it imposes upon per-
sons and property burdens designed to promote
the safety and welfare of the general public. It is
one of the powers which has been reserved by the
people of the state, and which cannot be surren-
dered, to require persons and corporations to so
exercise and enjoy their rights as not unneces-
sarily to injure others. That the principle stated
is especially applicable to existing rights, without
regard to the time of their acquirement or to the
source from whence they are derived, appears to
us a self-evident proposition not requiring argu-
ment, and the subject will not therefore be fur-
ther pursued in this connection.

The next and most important subject of inquiry
is presented by respondent's contention that the
ordinance under which the city proceeded in or-
dering the repairs in question contemplates the
taking of its property without due process of law,
within the meaning of the state and federal con-
stitutions, and also impairs the obligation of the
contract under which its track was laid and under
which said viaduct was constructed. The diffi-

culty attending a solution of the questions pre-
sented by this assignment is augmented from the
fact that courts have not always observed the dis-
tinction between the different reserved powers of
the state, and have cited indiscriminately cases
involving the police power, the taxing power, and
the power of eminent domain; nor is the confu-
sion on that account at all strange when we re-
member that those powers all depend for their
vitality upon a common principle, viz., the subor-
dination of private rights to the public welfare—
of the individual to the community. Of the cases
frequently cited to illustrate that principle many
involve an application of two or more of the pow-
ers enumerated, while in others the line of dis-
tinction is by no means clearly apparent. Many
attempts at defining the police power have been
made, but in none has the limit of its exercise
been defined with precision. It is, in the lan-
guage of Chief Justice Shaw in *Commonwealth v.
Alger*, 7 Cush. [Mass.], 53, "much easier to per-
ceive and realize the existence and sources of
this power than to mark its boundaries or
prescribe limits to its exercise." Doubtless the
safe course to pursue in attaining the desired re-
sult is that which is characterized by Mr. Justice
Miller in *Davidson v. City of New Orleans*, 96 U. S.,
97, as "the gradual process of judicial inclusion
and exclusion." We held in *Smiley v. McDonald*,
42 Neb., 5, that the legislature cannot, under the
guise of a police regulation, arbitrarily invade pri-
vate property or personal rights, but that the
court must be able to perceive some clear and real
connection between the assumed purpose of the
law and its actual provisions. The obvious pur-
pose of the legislation in this case, both state and

municipal, is to promote the convenience and safety of the public at a grade crossing which is judicially recognized as a place of danger. It is, in short, the exercise of the governmental power and duty to secure a safe and necessary highway, and must be upheld, if at all, as a legitimate exercise of the police power of the state. The authorities which fully sustain this proposition will be noticed in the course of our further examination of this case and need not be here cited. The questions presented by this assignment are in principle nearly allied, covering substantially the same field of inquiry, and will, for convenience, be considered together.

The proceeding by the mayor and council is, it it claimed, essentially judicial in character, and, to use the language of the respondent, "Such a proceeding, without notice to those concerned, and without giving them an opportunity to be heard, violates every maxim and principle of constitutional government." The term "due process of law" is, like the police power of the state, not susceptible of a precise definition. However, that of Judge Cooley appears to have proved the most acceptable to the courts of this country, viz., "Due process of law in each particular case means an exertion of the powers of government as the settled maxims of the law permit and sanction, and under such safeguards for the protection of individual rights as these maxims prescribe for the class of cases to which the one in question belongs." In *Board of Directors v. Collins*, 46 Neb., 411, we held, in effect, that the constitutional requirement with respect to that subject does not imply a hearing according to the established practice in courts of common law or equity, but that it

is satisfied whenever the citizen, whose property
is taken or damaged for public use, is afforded an
adequate remedy therefor in a court of competent
jurisdiction; and the doctrine is now firmly estab-
lished, although after some diversity of opinion,
that previous notice and an opportunity to be
heard by persons thereby affected is not indispen-
sable to a valid exercise of the police power, or the
power to levy and collect taxes, whether *ad
valorem*, by the ordinary means, or such as are de-
nominated special assessments and chargeable
against particular property.   In *McMillen v. An-
derson*, 95 U. S., 37, Mr. Justice Miller, in holding
that the courts of the United States could not be
invoked to prevent the collection of an alleged
illegal license tax levied by the state of Louisiana,
on the ground that the effect thereof was to take
the petitioner's property without due process of
law, said: "It seems to be supposed that it is es-
sential to the validity of this tax that the party
charged should have been present, or had an
opportunity to be present in some tribunal when
it was assessed.   But this is not, and never has
been, considered necessary to the validity of a
tax;   *   *   *   nor is the person charged with
such a tax without legal remedy by the laws of
Louisiana.   It is probable that in that state, as in
others, if compelled to pay the tax by a levy upon
his property he can sue the proper party and re-
cover back the money as paid under duress if the
tax was illegal."   True, it was said in *Barker v.
City of Omaha*, 16 Neb., 269, that "notice in some
form must be given a property owner before a
special assessment upon his property becomes
fixed and irrevocable;" but the learned author of
that opinion did not say, or imply, that the means

of redress afforded in other cases against illegal assessment fail to satisfy the constitutional inhibition against the taking of property without due process of law. What is meant, and what is the doctrine of the authorities there cited, is, that a property owner shall, before being required to pay, have an opportunity to be heard in the courts, in a proceeding instituted by himself or by the municipality to which the taxing power of the state has been by law entrusted. Although there are many cases in the state and federal courts in harmony with the opinion of Justice Miller, from which the foregoing is quoted, and fully sustaining the proposition here asserted, we prefer to confine our examination of such as involve an exercise of the police power rather than the power of taxation. In *Woodruff v. Catlin*, 54 Conn., 295, it is said: "The legislature having determined that the intersection of two railways with a highway in the city of Hartford, at grade, is a nuisance, dangerous to life, in the absence of action on the part either of the city or of the railroads, may compel them severally to become the owners of the right to lay out new highways and new railways over such land, and in such manner as will separate the grade of the railways from that of the highway at intersections; may compel them to use the right for the accomplishment of the desired end; may determine that the expense shall be paid by either corporation alone, or in part by both; * * * that the legislature of this state has the power to do all this for the specified purpose, and to do it through the instrumentality of a commission." *Appeal of New York & N. E. R. Co.*, 58 Conn., 532, involved the constitutionality of an act of the leg-

islature limiting the amount chargeable to a town
or village, on the separation of the grade of a high-
way from that of a railway track situated therein,
to one-fourth of whole cost of such improvement.
Such a limitation, it was argued, authorized the
taking of the appellant's property without due
process of law, inasmuch as it prevented the com-
missioner to whom the discretion was entrusted
from apportioning to the city a just and equitable
share of the burden imposed by the act; but the
court held otherwise. Carpenter, J., speaking for
the court, after remarking that the policy of the
law was to abolish grade crossings, said: "Legis-
lation on this subject assumes that each party, in
the discharge of its duty, is concerned in creating
the danger, and that each may justly be required
to contribute to the expense of its removal, or that
either may be required to pay the whole, and if
each contributes, that the proportion which each
shall pay may be determined by the legislature in
each case as it arises, or by general rule by itself,
or by a delegation of its power to the railroad
commissioners. This exercise of power is justifi-
able on the ground that government itself in the
discharge of its governmental duties undertakes
to remove the danger, and does it in the same
manner and through the same instrumentalities
that it provides and maintains highways through,
and at the expense of, the towns and other corpo-
rations. So far as towns are concerned, it is a
duty that has ever devolved upon them to keep
the highways reasonably safe. They are com-
pelled to act without compensation or pecuniary
profit. Their sole motive is the public welfare.
Railroad companies, in some sense, are but the
agents of the government in affording to the pub-

lic a more expeditious and vastly improved
method of travel. * * * Unlike towns, they
do not act upon compulsion, but by choice. Their
motive is private gain. Public benefit is inci-
dental. * * * They contribute largely to the
danger, and the state may well require them
to contribute largely to its removal. * * *
Requiring the railroad company to pay three-
fourths of the expense, however just it might
be to require the town to pay more than one-
fourth, is not a matter of which the railroad
company can legally complain." That doctrine
was reasserted by the same court in *Appeal
of New York & N. E. R. Co.*, 62 Conn., 527, which
was upon proceedings in error to the supreme
court of the United States affirmed and the
validity of the act in question expressly upheld.
(See *New York & N. E. R. Co. v. Bristol*, 151 U. S.,
556.) In the opinion last referred to this language
was used by Chief Justice Fuller: "Nor is there
necessarily such denial nor an infringement of
the obligation of contracts in the imposition upon
them [railroad companies] in particular instances
of the entire expense of the performance of acts
required in the public interest, in the exercise of
legislative discretion; nor are they thereby de-
prived of property without due process of law, by
statutes under which the result is ascertained in
a mode suited to the nature of the case, and not
merely arbitrary and capricious; and that the ad-
judication of the highest court of a state, that in
such particulars a law enacted in the exercise of
the police power of the state is valid, will not be
reversed by this court on the ground of an infrac-
tion of the constitution of the United States;"
and substantially similar views are expressed by

that court in *Missouri P. R. Co. v. Humes*, 115 U. S., 512, and *Eldridge v. Trezerant*, 16 Sup. Ct. Rep., 345.   In *Train v. Boston Disinfecting Co.*, 144 Mass., 529, a regulation of the board of health for the disinfecting of certain vessels, and goods imported therein, at the owner's expense, was assailed on the ground that no provision was by law made for a hearing, or for review by appeal or otherwise; but the court pronounced the regulation a reasonable one, and defensible as an exercise of the police power of the state.   In *Commonwealth v. Roberts*, 155 Mass., 281, an act required all buildings used for a designated purpose to be supplied with sufficient water closet connections.   It was held, although there was no provision for notice or hearing, that said act was a valid exercise of the police power and applicable to buildings erected before its enactment as well as to those subsequently constructed.   In *People v. Boston & A. R. Co.*, 70 N. Y., 569, the appellant company was required to construct a bridge over a turnpike road, on the ground that the state may, under the powers reserved to the legislature, impose upon railroad corporations such additional burdens as are essential to the public welfare.   In *State v. Missouri P. R. Co.*, 33 Kan., 176, the power of the city of Atchison to compel the respondents to construct viaducts was sustained under legislation substantially like that here involved.   Referring to the subject of notice, the court, by Valentine, J., observed: "We might, however, say that we do not think it is necessary that the city should have given the railroad company notice before passing the ordinance requiring them [respondents] to construct the viaduct.   Notice afterward, with an opportunity on the part of the railroad companies

to . contest the validity .of the ordinance, and the right of the .city to compel them to construct the viaduct, is sufficient." .But the clearest and most satisfactory exposition of the subject is found in Health Department v. Rector of Trinity Church, 145 N. Y., 32, which was an action to recover a penalty under a statute requiring all tenement houses to be supplied with water on each floor occupied, or intended to be occupied, by one or more families, whenever so directed by the board of health. The statute requiring all tenement houses to be supplied with water on each floor occupied, or intended to be occupied, by one or more families whenever so directed by the board of health. The statute made no provision for notice to property owners, and none was in fact given, while it was admitted that it would cost the respondent a considerable sum of money to comply with the order of the board. In the opinion of Peckham, J., it is said: "The legislature has power, and has exercised it in countless instances, to enact general laws upon the subject of the public health or safety without providing that the parties who are to be affected by those laws shall first be heard before they shall take effect in any particular case. * * * The fact that the legislature has chosen to delegate a certain portion of its power to the board of health * * * would not alter the principle, nor would it be necessary to provide that the board should give notice and afford a hearing to the owner before it made such order." And in answer to the argument that the effect of the act was to impair contract obligations, the same learned judge said: "Laws and regulations of a police nature, though they may disturb the

enjoyment of individual rights, are not unconstitutional though no provision is made for compensation for such disturbance. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffer injury, it is either *damnum absque injuria*, or, in the theory of the law, he is compensated for it, by sharing in the general benefits which the regulations are intended and calculated to secure. (See, also, *People v. Union P. R. Co.*, 20 Colo., 186; 37 Pac. Rep., 610; 1 Dillon, Municipal Corporations [4th ed.], sec. 141, and note; *Commonwealth v. Alger*, 7 Cush. [Mass.], 83; *Baker v. City of Boston*, 12 Pick. [Mass.], 183; *Thorpe v. Rutland & B. R. Co.*, 27 Vt., 140; Tiedeman, Limitations of Police Power, sec. 124; Prentice, Police Power, pp. 57, 58.) And the principle which underlies all of the cases cited was distinctly recognized by this court in *State v. Chicago, B. & Q. R. Co.*, 29 Neb., 412. It will not, of course, be contended that the power of the legislature is, in that respect, absolute, or that it may at will impose upon property burdens so unreasonable as to work a practical confiscation. There is, as all admit, a limit beyond which it cannot go and within which it will be confined by the judicial power of the state. (Prentice, Police Power, p. 31; *Minnesota v. Barber*, 136 U. S., 313.) But it is unnecessary, if it were possible, to point out the boundary line between reasonable and unreasonable exactions. It is enough that the courts will not interfere to prevent the enforcement of statutes on account of any mere difference of opinion between them and the law-making branch of the government respecting the wisdom or necessity of particular measures. To summarize briefly, we conclude,

from the foregoing authorities and many others
examined, that the legislation assailed in this
cause is a valid exercise of the police power of the
state over the subject to which it applies; that it
does not authorize the appropriation of the re-
spondent's property without due process of law in
a constitutional sense, since the latter is enabled
to invoke the equal protection of the law by any
appropriate proceeding, and because it did in fact
put in issue by the answer both the validity of
the ordinance and the reasonableness of the
amount apportioned to it for the repair of the via-
duct in question. Nor is such legislation viola-
tive of any contract obligation, since the power to
subserve the general welfare of the people by all
needful and proper regulations in the interest of
health and safety cannot be bartered away by
contract or otherwise. Such power is inherent in
the sovereignty of the state, and may be asserted
directly by the legislature, or may in the absence
of constitutional restriction upon the subject, be
delegated to the several municipal corporations
or other agencies provided for its exercise. The
single purpose of the legislation, whether con-
templating the erection or reconstruction of the
viaduct, is to reduce to a minimum the danger to
life and limb for which the railroad companies
are chiefly responsible, and it is not unreasonable
to require the parties to maintain the street in a
condition of safety, for whose benefit and conven-
ience it was originally rendered unsafe.

The argument assailing the ordinance on the
ground that it requires the respondent to repair
the south one-third of the viaduct, instead of con-
tributing a designated part of the entire cost, is,
we think, without merit. Section 48, above set

out, confers upon the mayor and council of the city plenary powers with respect to the subject. They may by ordinance determine the proportion of the viaduct and approaches to be constructed by two or more railroad companies owning or operating separate lines of track to be crossed thereby, or may determine the cost thereof to be borne by each. The ordinance, if not within the letter of the city's charter, is clearly within its declared scope and purpose. But in the absence of any statute regulating the manner of apportioning the cost of such repairs, it cannot be said that the plan adopted is either so inequitable or unreasonable as to amount to an abuse of the discretion conferred upon the officers of the city. Equally groundless is the contention that the city was required to proceed against the Chicago, Rock Island & Pacific and the Chicago, Milwaukee & St. Paul Railroad Companies, then engaged in operating, jointly with the Union Pacific Company, certain tracks belonging to the latter across Eleventh street and under said viaduct. The statute, as we have seen, authorizes the city to require two or more railroad companies owning or operating separate lines of track to erect, construct, reconstruct, or repair viaducts. If we admit the companies named, as lessees of the Union Pacific Company, to be within the terms of the act, it does not follow that they are in any sense necessary parties to the proceeding, since the city might still have proceeded against the owners of the tracks operated by them. Such is the plain and necessary inference from the language of the statute.

. Lastly, it is argued that, conceding the respondent's duty to repair the viaduct as commanded by

the ordinance, such duty is not one which will ·be enforced by means of the writ of *mandamus*. By reference to section 48 of the city's charter it will be observed that authority to proceed by *mandamus* or other appropriate proceedings is therein expressly conferred; but independent of that provision, *mandamus* has long been recognized as an appropriate remedy, if not the only adequate remedy, in cases of like character. Indeed, so firmly is that rule established by the decisions of this court as not to admit of a doubt at this time. (See *State v. Republican V. R. Co.*, 17 Neb., 647, 18 Neb., 512; *State v. Grand Island & W. C. R. Co.*, 27 Neb., 694; *State v. Chicago, B. & Q. R. Co.*, 29 Neb., 412.)

We discover no error in the record and the judgment of the district court is

AFFIRMED.