THE CITY OF CHICAGO

*v.*

JOHN JACKSON.

*Opinion filed April 16, 1902—Petition stricken from files June 5, 1902.*

1. POLICE POWER—*whether an act is within the police power is for the courts to determine.* While a municipal corporation has the right to determine, through its power delegated by the State, what is a reasonable exercise of its police power, yet it cannot arbitrarily attribute the doing of.an act to the police power, and it is a question for the courts to determine, finally, whether the act is within the police power.

2. MUNICIPAL CORPORATIONS—*interference with access to property by changing grade of street is a damage.* Any change in the grade of a street by which ingress to or egress from private property is obstructed is a damage to private property for public use, within the meaning of section 13 of article 2 of the constitution.

3. TRACK ELEVATION—*city liable for damages from changing grade of street.* Under the provisions of our present constitution a city is liable for any injury and damage occasioned to the property of the citizen by changes in the grade of the street on which such property abuts, whether such change is made by the city directly or by some corporation in obedience to a track elevation ordinance.

4. EVIDENCE—*diversion of traffic is not an element of damages.* In an action against a city for damages occasioned by changing the grade

of a street, diversion of traffic is not a proper element for the consideration of the jury, either as an element of damage or as bearing upon the question whether access to the property had been interfered with by the change of grade.

5. SAME—*what evidence improper on question of damages.* In a suit against a city for damage from the change in the grade of a street by the construction of a sub-way, under track elevation ordinance, evidence as to the number of trains which stopped at such street before and after the construction of the sub-way is inadmissible.

6. APPEALS AND ERRORS—*when errors in matters of procedure will not reverse.* If substantial justice has been accomplished through the trial in an action against a city for changing the grade of a street, and where it seems obvious that no decision more favorable to the appellant would result from another trial, the judgment will not be reversed because of errors in procedure.

7. REHEARINGS—*same party cannot have more than one petition.* It is the practice of the Supreme Court not to consider more than one petition for rehearing by the same party in the same cause, and the court will of its own motion strike a second petition from files.

*City of Chicago* v. *Jackson,* 88 Ill. App. 130, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JONAS HUTCHINSON, Judge, presiding.

CHARLES M. WALKER, Corporation Counsel, and THOS. J. SUTHERLAND, for appellant.

HAMLIN & BOYDEN, H. S. MECARTNEY, and LOUIS M. GREELEY, for appellee.

Per CURIAM: This action on the case was brought in the superior court of Cook county by appellee, against appellant, to recover damages for an injury to property fronting on West Fortieth street. In his declaration he avers that his property fronted on said street, and that prior to the acts complained of there was direct and convenient access to the same from the street, as well as egress therefrom, for persons and vehicles; that the street in front of the premises was level and on the same grade with the premises. He then avers that defendant, regardless of the rights of the plaintiff, in the year 1895

wrongfully excavated, or caused to be excavated, the said street in front of and adjacent to his premises, and constructed therein a sub-way of wood, stone, iron and other materials, of great depth below the grade of the street as it existed prior thereto, (describing the depression of the street and construction of the sub-way,) and charges that by means thereof the free and convenient access to his premises, and free communication between said premises and the street, has been entirely destroyed and cut off, and the said premises rendered unfit for the uses to which they were best adapted and for which they are most valuable, and the reasonable enjoyment and use of the same seriously interfered with, by means of which his rights in the premises have been violated, etc. He further avers that the excavation and sub-way were without his consent, and without making any compensation to him for the damages and injury occasioned, and without any proceedings to ascertain such damages, as provided by law, and that the defendant has refused and still refuses to make such compensation.

The city filed a plea of not guilty, upon which issue was joined and the case tried by the jury. At the close of all the evidence the defendant asked the court to instruct the jury to return a verdict in its favor, but the request was denied and an exception duly taken. The jury was then instructed that "if they believed, from the evidence, that the plaintiff's property was depreciated in its fair cash market value by the change of grade in the street, over and above any benefit conferred upon the property by the improvement, taken as a whole, they should find the defendant guilty, and assess the plaintiff's damages at such sum as they believed, from the evidence and under the instructions of the court, such property had been depreciated in its fair cash market value by reason of such change of grade." To the giving of this instruction the defendant also duly excepted. A verdict was returned in favor of the plaintiff, fixing his damages at $2000, upon

which the superior court, after overruling a motion for new trial, entered judgment. The city appealed to the Appellate Court for the First District, where the judgment was affirmed, and it now prosecutes this further appeal.

It appeared from an ordinance of the city introduced in evidence upon the trial, passed February 18, 1895, that the Chicago and Northwestern Railway Company was required to elevate the plane of its road-bed and tracks across this and other streets so as to obviate the grade crossings, that company having, at the time, its railroad track across the streets on the same level. The ordinance describes at length the required elevation of the railroad tracks and provides (sec. 4) for sub-ways changing the grade of the street, as follows: "At * * * the above named streets and avenues [West Fortieth street being one of the streets named] sub-ways therein shall be constructed, passing through said embankments and beneath said tracks so to be elevated as aforesaid, as follows: * * * All of which said sub-ways shall generally conform to the descriptions and dimensions contained in a schedule hereunto annexed and made part of this ordinance, entitled 'Schedule of Sub-ways'." The schedule of sub-ways describes the manner in which the excavations shall be made, how the sub-ways shall be constructed, etc. Section 15 provides that "when said railway shall be elevated in accordance with the provisions of this ordinance, or when any section thereof shall be so elevated and ready for use, then and thereupon all provisions of the ordinances of the city relating to speed of railway trains in said city, the giving of signals upon such trains, and the maintenance of gates, flagmen, watchmen, signals and signal-towers, shall cease to be applicable to such railway company so far as the lines of said road shall be elevated as herein required." Section 16 provides that the ordinance shall take effect from and after its passage, approval and publication,

provided that it shall be null and void unless said railway company shall, through its authorized officers, file with the mayor of the city, within sixty days from the passage of the ordinance, an agreement duly executed, whereby said railway company shall undertake to do and perform all the matters and things required of it by the ordinance, which "agreement by said railway company shall be made as a return for any liabilities * * * against it for any damages to adjacent property or business in consequence of change of grade of streets, avenues, alleys or the railway, or of the performance by the railway company of the matters and things in this ordinance required of the railway, and which agreement shall be held to relieve and protect said company from all liability to said city or others for such damages to adjacent property or business in consequence of change of grade of streets, avenues, alleys or the railway, or of the performance by the railway company of the matters and things in this ordinance required of it, save that for any damages occasioned by the negligent manner of doing said work by said company it shall be liable. After the filing of said agreement, as aforesaid, this ordinance shall not be materially modified or amended without the consent of said railway company, but nothing in this ordinance contained shall be deemed a waiver or surrender of the police power of the city or to deprive the city of the right to properly exercise such power." It further appears that the railway company did accept the provisions of the ordinance and elevated its tracks in conformity with the provisions thereof, making the subways as therein provided.

The plaintiff's property described in the declaration is situated on the south side of the railroad, fronting on said street, there being an alley between it and the right of way of the railroad company. The improvement was a two-story brick building, the first story being occupied as a saloon and the second story for roomers. The first

floor, prior to the excavation, was nearly on a level with the street. In making the sub-way the railroad company cut down the street in front of the building, so that the sidewalk is now four feet above the roadway and the floor of the building four feet above the sidewalk, making the floor eight feet above the grade of the street, and requiring seven steps in the sidewalk at the north-west corner of plaintiff's building and seven steps from the sidewalk in order to reach the level of the first floor of the house. It is not denied by the city that the property was damaged in the manner alleged.

The theory of the plaintiff's case is, that the city having thus changed the grade of the street, or caused the same to be done, so as to damage his property, he is entitled to recover under that provision of the constitution which provides, "private property shall not be taken or damaged for public use without just compensation." The city insists there can be no recovery, for the reason that "private property has not been taken for public use," but that whatever injury has been done to plaintiff's property is the result of the legitimate exercise of the police power of the State and the damages *damnum absque injuria.* Therefore, it is insisted, it was error in the trial court to refuse the peremptory instruction to find for the defendant and to give instruction No. 1 on behalf of the plaintiff.

The question in this form is a new one in this State, and so far as we have been able to ascertain has never been directly decided by any court. It is a question of the first importance both to the city and property holders upon streets over which the railroads in the city must be elevated, in the interest of the public safety to life and property.

It would seem from section 15 of the foregoing ordinance that the improvement was made rather by the agreement of parties than by the order or command of the city, and that both parties understood and contem-

plated damages to private property as a result of the work. That section is wholly inconsistent with the idea that the tracks of the railroad were elevated and the sub-way constructed in obedience to a requirement of the city in the exercise of its police power. But aside from any question of that kind, we think the judgments of the superior and Appellate Courts on this branch of the case must be affirmed. It is conceded by all parties that the municipality had the right, in the legal exercise of its police power within reasonable limits, to require the railroad company to elevate its tracks so as to avoid the grade crossing upon the street, and thus protect the lives and property of its citizens. (*Chicago and Northwestern Railway Co.* v. *City of Chicago*, 140 Ill. 309; *New York and New England Railroad Co.* v. *Bristol*, 151 U. S. 556; *Burlington and Quincy Railroad Co.* v. *City of Chicago*, 166 id. 226.) Many other authorities might be cited to the same effect, but the question is now regarded as not an open one. It is also well settled that every corporation and citizen holds its or his "property subject to the proper exercise of this power, either by the State legislature directly, or by public corporations to which the legislature may delegate it. Laws and ordinances relating to the comfort, health, convenience, good order and general welfare of the inhabitants are comprehensively styled 'police laws or regulations;' and it is well settled that laws and regulations of this character, though they may destroy the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbance. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury, it is either *damnum absque injuria*, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure." (Dillon on Mun. Corp. sec. 212; Sedgwick on Stat. and Const. Law, 435; *Bancroft* v. *City of Cambridge*,

126 Mass. 438; *Railroad Co.* v. *Commissioners*, 79 Me. 386.)
The maxim of the law is, *"salus populi est suprema lex,"*—
the safety of the people is the supreme object of the law.
It is not a taking of private property for public use, but
a restraint on the wrongful use of property by the owner,
in violation of the rule, *sic utere tuo ut alienum non lœdas.*
See authorities above, and *People* v. *Budd*, 117 N. Y. 1;
*State* v. *Moore*, 104 N. C. 714; *Chicago, Burlington and Quincy
Railroad Co.* v. *State*, 47 Neb. 549; 53 Am. St. Rep. 557;
*First Nat. Bank of Mt. Vernon* v. *Sarlls*, 129 Ind. 201.

The cases in which the right to exercise the power
has usually arisen, are cases in which the State or some
municipal corporation to which the power had been dele-
gated was asserting the power, and the party defending
in such cases has been the one against whose conduct
or property the power was sought to be enforced.   The
long list of authorities cited by counsel for appellee are
of this class, among which is *Chicago and Northwestern
Railway Co.* v. *City of Chicago, supra,* and which cases,
as to the question here involved, have no application.
While "the limit of the power cannot be accurately de-
fined and the courts have not been able or willing defi-
nitely to circumscribe it," (*Pumpelly* v. *Green Bay Co.* 13
Wall. 166,) still the courts have generally found no great
difficulty in determining whether or not it had been le-
gally and reasonably exercised in a given case.

It seems to be thought by counsel for the city that in-
asmuch as the railroad company has been lawfully com-
pelled to abandon its tracks on the street and so elevate
them as to overcome the grade crossing, at great loss
and expense to it, without compensation, neither should
the plaintiff, who has suffered loss on account of the
construction of the same work, be allowed to recover
damages therefor.   The position, upon first impression,
seems plausible, but when carefully considered is clearly
untenable.   The relations of the parties to the city are
entirely different.   That which called for the exercise of

the police power by the municipality was the operation of the railroad in running its trains across the street. Neither the location nor use of the plaintiff's property endangered the public health or safety, and it must be admitted that if the city had attempted to interfere with that property by obstructing his access thereto under any claim of a police regulation, it would have been a flagrant abuse of the police power and no defense whatever to an action for the resulting damages. The plaintiff bears no relation to the railroad company. He had nothing to do with the operation of its road. He makes no claim in his declaration on account of the elevation of the tracks. His cause of action is against the city for so changing the grade of the street as to damage his property. Police power is very broad and comprehensive, and is exercised to promote the health, comfort, safety and welfare of society, but there is no particular magic or potency in the term. "Rights of property can not be invaded under the guise of the police power. All-embracing and penetrating as the police power of the State is and of necessity must be, *it is nevertheless subject, like all other legislative power, to the paramount authority of the State and the Federal constitution. A right conferred or protected by the constitution cannot be overthrown or impaired by any authority derived from the police power.*" (1 Dillon on Mun. Corp.—3d ed.—sec. 142.) It is undoubtedly true that the State, through the legislature, has the right to determine what shall be a reasonable exercise of the power, and so the municipal corporation, through its delegated power, may do so, but it cannot arbitrarily attribute the doing of a thing to the police power, whether reasonably done or not. It is a question finally for the courts to determine whether an act is within the police power. "There is a limit beyond which it cannot go and within which it will be confined by the judicial power of the State." Prentice on Police Power, 31; *Minnesota v. Barber*, 136 U. S. 313.

It is urged on behalf of the city that the making of the sub-way was merely incidental to the elevation of the tracks, and necessary in order that the railroad might reach its stations, etc. There is nothing in this record upon which to base that claim, and if there was, the fact could not justify the taking or damaging of the plaintiff's property without compensation. Suppose the railroad company had simply been ordered to elevate its road without any provision for the sub-way, and it had resisted the order upon the ground that the requirement was unreasonable or impracticable; could the city have compromised with it by changing the grading of the street, thereby damaging private property, and be exempt from liability for damages? Or, suppose that, in order to relieve the company of expense or inconvenience, the city had undertaken to change the location of the street, taking private property for that purpose; would it be claimed that as to the property holder such taking would be but a reasonable exercise of the police power? We certainly think not. It has been uniformly held by this court that any change in the grade of a street by which egress and ingress is obstructed to the private property of an owner is damaging private property for public use, within the meaning of section 13 of article 2 of the constitution of 1870. (*Rigney* v. *City of Chicago*, 102 Ill. 64; *Chicago and Western Indiana Railroad Co.* v. *Ayres*, 106 id. 511; *City of Bloomington* v. *Pollock*, 141 id. 346; *City of Joliet* v. *Blower*, 155 id. 414.) The rule thus uniformly announced has never been qualified or limited by the object or purpose which the municipality had in view in ordering the change. It is true that the term "police power" is not mentioned in the opinion of the court in these cases, nor, so far as we know, was it referred to in the briefs and arguments of counsel; but the question argued and decided in each of them was the liability of the city, under the foregoing clause of the

constitution, in making the change in the grade of the street, and it was in every case held that it was liable.

The case of *Frazer* v. *City of Chicago*, 186 Ill. 480, as well as cases cited by counsel to the effect that private property may be destroyed under the police power without compensation, in order to prevent the advance of an invading army or the spread of a conflagration, are clearly distinguishable from the case at bar. In the *Frazer case* there was no direct physical injury to the property of the plaintiff. His case was of the class referred to by Justice MULKEY in *Rigney* v. *City of Chicago*, where he says: "For instance, the building of a jail, police station, or the like, will generally cause a direct depreciation of the value of neighboring property; yet that is clearly a case of *damnum absque injuria*." The constitutional guaranty against the taking of private property for public use had therefore no application whatever.

The right to destroy property in order to save it and other property from destruction by fire or the devastation of an army is a right which is frequently referred to the exercise of police power, but it is a right growing out of the immediate and pressing necessities of the occasion. It may be exercised by an individual as well as by the State or a municipal corporation. It grows out of the urgent public safety, and unless these conditions clearly appear the right does not exist. Dillon, in his work on Municipal Corporations, (sec. 955,) says: "The ground of this exemption from liability is the *public necessities*—the public good; and therefore, if the public good did not require the act to be done,—if the act was not apparently and reasonably necessary,—the actors cannot justify, and would be responsible." (See, also, *Field* v. *City of Des- Moines*, 39 Iowa, 575; 18 Am. St. Rep. 46, and authorities there cited.) In all such cases the emergency is such that no action can be taken for the purpose of condemning the property and ascertaining the damages in advance. No one will seriously contend that there was

an immediate and urgent necessity for the damaging of plaintiff's property, within the rule announced in any of the cases referred to.

We think the trial court properly refused to take the case from the jury and committed no error in giving said instruction.

The remaining grounds of reversal were heretofore considered and properly disposed of, as follows:

"It is urged the judgment should be reversed because of the rulings of the court restricting (as counsel for the appellant city urges) the expert opinion of the witness Brady as to the depreciation in the value of property 'by reason of the hard times,' to property within two or three blocks of appellee's premises. We have examined the testimony of this witness. The following extracts therefrom, as given in appellant's abstract, manifest the witness was not improperly restricted. The extracts are as follows: 'There has been a depreciation in the value of property throughout the city, by reason of what is called the panic of 1893, of from twenty-five to fifty per cent. It has depreciated that in that territory very much—north of Lake street more than it has in other localities. It has depreciated property on these streets that are parallel with Fortieth street very much. * * * I have property for sale in my hands three blocks from this property, east on Ayers avenue. That is a street paved with asphalt. The depreciation in the vicinity of the Jackson (appellee's) property is fifty per cent at least. The fair cash market value of that Jackson (appellee's) property before the change in the grade in 1895, —land and buildings,—I consider the building worth at that time about $5000. That property at the time had suffered a great depreciation from the panic. The land was worth, in my opinion, $50 a foot. The panic started the World's Fair year. I could not say whether it has stopped yet or not. Real estate appears to be going lower. The sales last year were less than the year be-

fore.' The suggestion of the court, made while this tes-
timony was being heard, that the witness should limit
his testimony to property within two or three blocks
of the appellee's property, was rather for the purpose
of requiring the witness to testify as to depreciation of
property in the neighborhood of appellee's property, the
witness having, before the suggestion was made, stated
the per cent of depreciation of property generally in the
city, and in specified portions of the city more or less
remote from the Jackson property.

"Nor do we think the judgment should be reversed
because of the rulings of the trial court as to the admis-
sibility of evidence designed to be produced by a ques-
tion propounded to one McLane, a witness for the city.
The witness was introduced as an expert in the matter
of real estate values. He expressed to the jury the opin-
ion that the elevation of the tracks and the construction
of the sub-way had added to the value of the appellee's
property, and that such property had been increased in
value thereby at least thirty per cent. He was then
asked by counsel for the city, what, in his opinion, had
been the effect, generally, upon property adjacent to
other sub-ways in the city, and he stated it had been
beneficial and had raised the market value of such prop-
erty. The complaint is, the court declined to allow the
witness to express his opinion as to the rate per cent of
benefit to such other property upon each of many other
different sub-ways along the line of the Illinois Central,
the Lake Shore and the Rock Island railroads. There is
no just ground of complaint of the action of the court in
the examination of this witness.

"The trial court fell into error in respect of other rul-
ings in the case, but upon a careful consideration we are
inclined to agree with the Appellate Court that the judg-
ment in the sum of $2000, as rendered, is well supported
by competent testimony, and that such errors did not op-
erate to the prejudice of the appellant city. Upon these

points the following portion of the opinion announced by the Appellate Court in the case is adopted, as giving expression to the views of this court:

"'Evidence was admitted tending to show what the extent of traffic was upon the east sidewalk of West Fortieth street compared to the traffic on the west sidewalk, and to show that, by reason of the change in the grade, traffic had been diverted from the east to the west side of the street. This testimony could only be proper in so far as it was, of necessity, brought out in discovering the elements upon which the experts based their opinions. It was not competent to show such temporary diversion of traffic as an element proper for the jury to consider in assessing damages, (*Hohmann* v. *City of Chicago,* 140 Ill. 226,) and so far as its admission may be said to have been for that purpose it was error. It was sought to cure the error indicated by an instruction given to the jury by the court, by which they were informed that the evidence as to traffic could only be considered for the purpose of arriving at a conclusion as to whether access to the premises of appellee had been interfered with by the change of grade. This is the instruction the giving of which constitutes one of the errors assigned and argued. We are of the opinion that the instruction failed to cure the error. The matter of the physical condition of the street and sidewalk and lot and building were all capable of direct and certain proof, without resort to proof dependent upon the action of the traveling public. Whether access was in fact cut off or impeded could be determined by a showing of the physical condition through witnesses and by the view of the premises which was had by the jury, without looking to the actions of persons passing upon the street and attempting to analyze their motives for taking the one sidewalk or the other.

"'Another error complained of was the admitting of evidence as to the number of trains which stopped at

the station at West Fortieth street, near the property in question, before and after the change of grade. This presented an element which the jury could not properly consider in assessing appellee's damages.   *   *   *

" 'Counsel for appellee were permitted, over objection, to cross-examine one expert as to his knowledge of the number of tenants in a building opposite to the property of appellee. It was not proper as a measurement of the damage to appellee's property. *Metropolitan West Side Elevated Railroad Co.* v. *White*, 166 Ill. 375.   *   *   *

" 'The only remaining question to be considered is as to whether the errors above indicated are such as should lead us to reverse the judgment and remand the cause for another trial. We are of opinion that they are not. It is beyond dispute that appellee's property has been put to a disadvantage and damaged by having the side-walk and street in front of it lowered, the one to the extent of four feet and the other to the extent of eight feet. No amount of expert evidence would be likely to ever convince any jury that this did not effect a damage to the property. The witnesses who testify to values and extent of injury do not differ widely, except in the case of those who testify that there was no damage. Coe testified to damages amounting to $3500; Bogue estimated the damage at from $3500 to $4000; Snyder at $3400, and Cushing at $4000. The witnesses who testified simply to the cost of adjusting the building to the new grade of the street, fixed the cost at different sums. Marble at $2539.86, Holman at $2543 and Cook at $2529.35. Mace, a witness called by the city, testified as follows: 'Q. Mr. Mace, in your judgment, would it be the best thing for Jackson to lower his building lower than the sidewalk, down to the street level?—A. Well, I certainly would like it, if I owned it, that way, similar to across the street.' This witness testified that to lower the building to the sidewalk level only would not be 'a feasible changing of the building,' and that to lower it to

the street level, four feet below the sidewalk, which was the only feasible adjustment to the new conditions, would cost $2080.40.

" 'We think it apparent from all the evidence that the property of appellee has been damaged, and that the verdict assessing that damage at $2000 was a fair and just ascertainment. Where substantial justice has thus been accomplished through the trial, and where it seems obvious that no decision more favorable to the appellant would result from another trial, it is not necessary, nor is it proper, that the judgment should be reversed because of the errors in procedure above indicated. *Newkirk* v. *Cone*, 18 Ill. 449; *Dishon* v. *Schorr*, 19 id. 59; *Schwarz* v. *Schwarz*, 26 id. 81; *New England Fire and Marine Ins. Co.* v. *Wetmore*, 32 id. 221; *Pennsylvania Co.* v. *Stoelke*, 104 id. 201; *Lebanon Coal and Machine Ass.* v. *Zerwick*, 77 Ill. App. 486; *Indiana and Illinois Southern Railway Co.* v. *Wilson*, id. 603.' "

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Afterwards, on June 5, 1902, upon considering a petition for a rehearing filed in this cause by the city of Chicago, appellant, the court, speaking through Mr. Justice HAND, announced the following additional oral opinion:

A petition for a rehearing has been filed in this cause on behalf of the city of Chicago, appellant. Two previous petitions for rehearing have been filed and duly considered by the court in this case,—one by the appellant and the other by the appellee,—both of which petitions were allowed by the court and rehearings of the cause actually had under them, respectively. Under the practice recognized and acted upon in this court, the same party is not permitted to have more than one petition for a rehearing in one and the same case. It is therefore ordered that the petition for a rehearing by the appellant be and the same is hereby stricken from the files.

*Petition stricken.*