CITY OF SCOTTSBLUFF, A MUNICIPAL CORPORATION, APPELLANT, V. WINTERS CREEK CANAL COMPANY, A CORPORATION, ET AL., APPELLEES.

53 N. W. 2d 543

May 16, 1952. No. 33154.

724

*Jack Lyman,* and *Neighbors & Danielson,* for appellant.

*Mothersead, Wright & Simmons,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, a city of the first class, brought this action against defendants, Winters Creek Canal Company, a Nebraska irrigation corporation, and its directors, to obtain a mandatory injunction requiring them to comply with the provisions of a city ordinance. Concededly defendants had not complied therewith, and they defended upon the ground that the ordinance was arbitrary, unreasonable, and confiscatory. Thus as an attempted exercise of police power, it was alleged to be unconstitutional and unenforceable as to them. After a hearing upon the merits the trial court rendered a judgment dismissing plaintiff's action with prejudice, and decreeing that the ordinance was unconstitutional and null and void as applied to defendants' canal and laterals.

Plaintiff's motion for new trial was subsequently overruled and it appealed, assigning substantially that: (1) The judgment was not sustained by the evidence but was contrary thereto and contrary to law; and (2) the trial court erred in rejecting or refusing to take judicial notice of certain evidence offered by plaintiff. We conclude that the assignments should not be sustained.

The ordinance, passed and approved June 3, 1947, provided in substance that all open ditches and canals extending through any part of the city which are in excess of 3 feet in width at the natural surface of the ground and 12 inches deep below such surface, in which water 6 inches or more deep is permitted to flow during any period of any year, are dangerous to health, life, and property of inhabitants of the city and the public generally, and are public nuisances. It then provided that on or before November 1, 1947, the owner or owners of any such ditch or canal should abandon and fill it to the level of the natural surface, or in the alternative should construct a pipe or conduit therein "of sufficient size and capacity to carry or conduct into and through such pipe or conduit all of the water which may be permitted to flow through such ditch or canal; * * *." The top of such pipe or conduit was required to be placed not less than 12 inches below the natural surface of the adjacent ground and be covered with earth to the level thereof. Such owners were also required to construct in a good and substantial manner a screen at the head of such pipe or conduit and were permitted to construct necessary manholes which were required to be kept securely covered except as necessarily in use, when they must be guarded. All of such pipes, conduits, screens, and manholes were required to be maintained and kept in good order and repair by the owners at their expense. It was made unlawful for any such owners to fail or neglect to comply with any of such provisions, the daily violation of which was each made a misdemeanor punishable by fine and commitment to the city jail until such fine and

costs were paid, secured, or otherwise discharged according to law.

The pertinent facts are not in dispute. Winters Creek Canal Company is a Nebraska corporation organized and operated as a common carrier under the provisions of Chapter 46, article 2, R. S. 1943, for the purpose of furnishing and delivering water for irrigation at reasonable rates to be fixed by the Nebraska State Railway Commission. It was required to keep its works, canals, and laterals in reasonable and proper repair for the delivery and diversion of water to appropriators therefrom, under the control and direction of such commission. It is the owner of an appropriative right to the water of the North Platte River, with a priority date of October 18, 1888. Its canal, 12 miles in length, passes through certain described lands, and, according to its appropriation, "covers and reclaims" described lands "amounting in all to about 8700 acres."

As provided in the articles of incorporation, its capital stock is $100,000, divided into 1,000 shares of the par value of $100 each, to be paid for in cash or its equivalent. The highest amount of its indebtedness is thereby limited to two-thirds of such capital stock. Approximately two-thirds of such stock is owned by landowners under the canal, and one-third thereof by others.

The company's sources of revenue are an annual acre assessment against the land, plus water turn-out charges not based on acreage but on each turn-out, which sums, responsive to estimated expenses, are ordinarily fixed by the stockholders at their annual meeting. The 1951 assessment was $2.50 an acre, with a turn-out charge of $2.50. Some of the lands do not ordinarily require irrigation. Therefore, its average annual acreage irrigated under the canal was approximately 3,800 acres, of which a small portion, 386 acres, lies west of the city's corporate limits. Some of the land is undesirable, some of it is just fair in quality, and the best is now valued at perhaps $200 an acre.

Construction of the company's canal was authoritatively begun in November 1888, and by the next year 10 miles of it had been completed. In 1890 it was enlarged and extended to its present length. The city of Scottsbluff was organized in 1900, at which time all land north and south of the canal was agricultural. No part of the canal or its laterals was enveloped within the corporate limits of the growing city until in 1920, some 30 years after it had been constructed. In 1946, some 56 years after construction of the canal, and again in 1950, since the commencement of this action, other tracts through which the canal and its laterals were constructed became a part of the city. The record also discloses that if the growth of the city continues as it has in the past, additional portions of the canal and its laterals will eventually be included within the corporate limits.

A concededly competent civil engineer, who had been personally and professionally cognizant of the canal and its laterals for many years, made a recent survey and plat of that portion of the canal and laterals within and adjacent to the city. They are all a foot or more deep and three feet or more in width at the top, and carry in excess of six inches of water during some period of each year. Such engineer estimated and it is not disputed that the then cost of compliance with the ordinance would be $138,632.46 if a 72-inch pipe of "sufficient size to carry all water which may be permitted to flow through" such canal and laterals was installed, with smaller ones in the laterals, and that subsequent maintenance costs would also be increased. The installation of an inadequate 60-inch pipe in the main canal would reduce the cost to $117,197.06. The cost under the first figure of $138,632.46 would be $36.48 an acre upon the basis of 3,800 acres, the average annually irrigated, or $21.60 an acre upon the basis of 6,400 acres which could be irrigated. The cost under the second figure of $117,197.06, upon the basis of a 60-inch pipe

claimed by plaintiff to be adequate for 3,800 acres, would be $30.82 an acre. All such computations, however, clearly overlook the fact that as the city grows in the future and envelops the canal and laterals, the cost would mount proportionately for future compliance.

Officers of the company testified, and it is undisputed, that the company has never paid a dividend, has no surplus or property except its irrigation works plus $794.21 cash on hand, and that there was no possible way for the company to finance such a project and comply with the ordinance. The ultimate result would thus be abandonment of the irrigation project as provided in the ordinance, and confiscation of the company's property without due process or payment of just compensation therefor.

Six witnesses who lived near the canal testified for the city in an attempt to establish that the canal was dangerous for children. One such witness was a renter of property near the canal. The others had built or purchased their homes there, well knowing about the canal. They did so because proximity of the canal made their lots or properties cheaper. Naturally the city and such witnesses as well wanted the ordinance complied with because it would not only beautify the city but also enhance the value of their property. In that connection, however, the exercise of police power delegated to a municipal corporation cannot be invoked by it on purely aesthetic grounds. Baker v. Somerville, 138 Neb. 466, 293 N. W. 326; Standard Oil Co. v. City of Kearney, 106 Neb. 558, 184 N. W. 109, 18 A. L. R. 95; 37 Am. Jur., Municipal Corporations, § 289, p. 930.

Each of such witnesses detailed an incident whereat a child fell into or was found in the canal and either got out himself or was removed therefrom by others. Three such witnesses and another who was a witness for defendants, testified that culverts built by plaintiff city in the canal were too small and too high above the bottom of the canal to carry the water. Thus it was

forced back up therein, making the water deeper.

It appears that but one such incident surely happened before the ordinance was passed. That incident happened seven years previously. Therefore, none of such incidents could have been any inducement to passage of the ordinance. It also appears that but one person testified concerning any incident relating to his or her own children, and that no child ever lost its life or was seriously injured.

Generally, irrigation water runs in the canal and laterals from May to October. However, at various other times there has been some water therein. Photographs taken in December 1949 and April 1950 and 1951 respectively appear in the record, showing some grass and weeds in and along the sides of the canal or laterals, with a small amount of standing or slowly moving debris-laden water lying therein.

It will be noted, however, that this is not an action to abate any such alleged nuisance resulting from the manner or method of operating the canal, but rather is one to require defendants to abandon its property or reconstruct it in a particular manner, because as originally and lawfully constructed it is of itself an alleged legislative nuisance in which the court is called upon to scrutinize validity of an attempted legislative exercise of police power.

Another photograph taken in May 1950, evidently after a rain, shows mud in the alley, disconnected water in the street, and running water in the canal a foot or less from the top. The water in the canal and laterals does not flow with rapidity or in great volume, and could not possibly be a danger to any person except very small, unattended children, whose parents established homes nearby, well knowing the situation.

In Standard Oil Co. v. City of Kearney, *supra,* this court held: "In the exercise of police power delegated to a city, it is generally for the municipal authorities to determine what rules, regulations and ordinances

are required for the health, comfort and safety of the people, but their action is not final and is subject to the scrutiny of the courts."

As stated in Union Pacific R. R. Co. v. State, 88 Neb. 247, 129 N. W. 290, quoting from In re Anderson, 69 Neb. 686, 96 N. W. 149: " 'The test in such cases is whether the regulation in question is a bona fide exercise of the police power or an arbitrary and unreasonable interference with the rights of individuals under the guise of police regulation.' "

A legal presumption exists in favor of validity, and unless the contrary appears upon the face of the ordinance, the burden is upon the party attacking it as invalid to show by clear and unequivocal evidence that the regulation imposed by it is so arbitrary, unreasonable, or confiscatory as to amount to depriving such party of property without due process of law. State ex rel. Andruss v. Mayor, 120 Neb. 413, 233 N. W. 4; Council Bluffs Transit Co. v. City of Omaha, 154 Neb. 717, 49 N. W. 2d 453.

In 62 C. J. S., Municipal Corporations, § 204, p. 381, it is said: "In passing on the reasonableness of municipal ordinances and regulations, the courts may consider the object to be accomplished, the means for its accomplishment, and all the surrounding facts and circumstances."

In Enterprise Irrigation Dist. v. Willis, 135 Neb. 827, 284 N. W. 326, this court said, citing numerous authorities: "That an appropriator of public water, who has complied with existing statutory requirements, obtains a vested property right has been announced by this court on many occasions." In the opinion this court quoted with approval from Herminghaus v. Southern California Edison Co., 200 Cal. 81, 252 P. 607, as follows: " 'It may be conceded that the phrase "police power of the state" has, as to its scope and meaning been subjected to a quite severe strain of recent years in the endeavor to so expand it as to cover all sorts of legislation sought to be enacted in the asserted interest of modern progress;

but we have yet to be referred to a case wherein it has been judicially so far expanded as to invest the legislative department of this state with arbitrary power to destroy vested rights in private property when such rights are being exercised and such property is being employed in the useful and in nowise harmful production of wealth, and when such use and the product thereof cannot be said or shown to be inimical to public health or morals or to the general welfare; but, on the contrary, must be conceded to be beneficial to each and all of these.' "

As stated in 62 C. J. S., Municipal Corporations, § 146, p. 301: "Municipal powers and regulations, including police powers, are subject to the limitations of both the federal and state constitutions. In general, whatever the state itself is prohibited from doing is equally prohibited to its municipal corporations." As stated in 62 C. J. S., Municipal Corporations, § 149, p. 306: "A municipal regulation, particularly one enacted in the exercise of the police power, is not necessarily invalid because it infringes on private rights; but such infringement should not be arbitrary or unreasonable."

In Webber v. City of Scottsbluff, 141 Neb. 363, 3 N. W. 2d 635, this court said: "In this connection we are not unmindful of the rule already stated that municipal corporations are prima facie the judges respecting the necessity and reasonableness of their regulatory ordinances, but this rule cannot be carried to the extreme of requiring us to hold on the face of the ordinance that restrictions upon a lawful business having no inherent, generally recognized, or legislatively declared vices are regulations proper under the police power."

Also, as held in Jewel Tea Co. v. City of Geneva, 137 Neb. 768, 291 N. W. 664: " 'The exercise of the police power by a municipal corporation must be directed towards and have a rational relation to protection of a basic interest of society rather than the mere advantage of particular individuals and must be reasonable and

free from arbitrariness.' N. J. Good Humor, Inc., v. Board of Commissioners, 11 Atl. (2d) 113."

In State ex rel. Westminster Presbyterian Church v. Edgecomb, 108 Neb. 859, 189 N. W. 617, 27 A. L. R. 437, this court quoted with approval from Chicago, B. & Q. R. R. Co. v. Drainage Commissioners, 200 U. S. 561, 26 S. Ct. 341, 50 L. Ed. 596, as follows: " 'And the validity of a police regulation, whether established directly by the state or by some public body acting under its sanction, must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable and whether really designed to accomplish a legitimate public purpose. Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare.' "

In Chicago, B. & Q. R. R. Co. v. State, 47 Neb. 549, 66 N. W. 624, 53 Am. S. R. 557, 41 L. R. A. 481, this court said: "It will not, of course, be contended that the power of the legislature is, in that respect, absolute, or that it may at will impose upon property burdens so unreasonable as to work a practical confiscation. There is, as all admit, a limit beyond which it cannot go and within which it will be confined by the judicial power of the state."

In Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321, the court said: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain

magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power. * * * The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said, this is a question of degree —and therefore cannot be disposed of by general propositions."

In Commonwealth v. Reed, 34 Pa. 275, 75 Am. Dec. 661, it is said: "It would, indeed, be strange, that any legal proceeding could be instituted in a county through which a great public work passes, by which the whole purposes of the improvement might be destroyed, upon the singular allegation, that what has been constructed under the express authority of the legislature, is a great public nuisance."

In 37 Am. Jur., Municipal Corporations, § 286, p. 923, it is said: "In the same way, property rights may not be arbitrarily interfered with or destroyed, or property taken without compensation, under the guise of municipal police regulations. An ordinance which permanently so restricts the use of property that it cannot be employed for any reasonable purpose goes, it is plain, beyond regulation, and must be recognized as a taking of property." As stated in 37 Am. Jur., Municipal Corporations, § 292, p. 935: "An ordinance which declares to be a nuisance that which is not a nuisance, but which may become such under certain circumstances, should be directed against circumstances which are harmful, and not against a particular type of property which, in itself

and aside from the harmful circumstances, is not harmful. A distinction must be taken between a structure itself and the use to which it has been put." See, also, 37 Am. Jur., Municipal Corporations, § 293, p. 935, citing authorities from almost every jurisdiction.

Plaintiff, in support of its contentions, relied primarily upon Platte & Denver C. & M. Co. v. Dowell, 17 Colo. 376, 30 P. 68, decided in 1892. On the other hand, defendants relied primarily upon City of Twin Falls v. Harlan, 27 Idaho 769, 151 P. 1191, decided in 1915 and subsequently affirmed in Hendrix v. City of Twin Falls, 54 Idaho 130, 29 P. 2d 352, decided in 1934, and again cited with approval in State v. Finney, 65 Idaho 630, 150 P. 2d 130, decided in 1944.

In that connection, the afore-cited case relied upon by plaintiff is clearly distinguishable from that at bar not only upon the facts but also upon the issues presented for decision. It was an action to recover damages for the death of a boy by drowning because defendant was allegedly guilty of negligence per se in failing to comply with a state statute containing provisions comparable in some respects with the ordinance at bar, which statute applied to all cities of the first class or their equivalent, and preserved the right of recovery in such cases. Defendant, appellant therein, a milling corporation, owned and operated a large uncovered and unprotected canal for milling purposes, as distiguished from irrigation, which conveyed a large volume of water a distance of several miles through a thickly populated district of Denver. The incline was such that the large volume of water necessarily flowed with great rapidity; as the court said, "a constant menace to life and property" which the corporation "has no constitutional right to perpetuate * * *." It was concluded that the statute was not the imposition of an unreasonable precaution, and under the particular circumstances appearing did not unlawfully deprive appellant of its property or the

enjoyment thereof. We do not have such a situation presented here.

On the other hand, the afore-cited case relied upon by defendants is directly in point, and, we conclude, of controlling force in the case at bar. Here in fact we have a stronger case in defendants' favor, because compliance with the unreasonable ordinance would also be confiscatory and take from or deprive defendants of their property without due process of law or payment of just compensation therefor, and in the future would continue to do so as the city, benefiting therefrom, grew and enveloped defendants' property.

Briefly, in that cited case the facts were that during the months of September and October 1904, the irrigation canal involved was authoritatively constructed. The lands through which it was constructed were then unclaimed sagebrush territory. In December 1904 such lands were platted as town lots. Following its construction the land became settled, and in 1905 first a village government and later the city government of Twin Falls was established, which subsequently passed an ordinance comparable in material respects with that here involved. Concededly it was not complied with and the manager of the irrigation company was convicted and fined for failure to comply. He appealed and, as stated in the opinion, under facts comparable with those here involved: "No unusual conditions exist. Nothing is harmful or dangerous aside from the fact that the people live near it and may fall into it. * * * The general power of a city to declare, prevent and abate a nuisance does not include the power to declare anything a nuisance which is not one in fact nor one per se."

Significantly, the court also said: "A ditch or canal that was constructed prior to the time that a town or city was located along it occupies substantially the same position with reference to the city and its inhabitants as would a natural stream. If the water of a natural stream is used for the irrigation of lands along its course,

it would not be just or right to compel such users to cover the stream where it ran through a village or city; it would develop upon the municipality to place such barriers along such stream as would be necessary to protect its people. A canal company is under the obligation to keep its canal in proper repair and proper condition to furnish the water users with water, and if this is properly done, the municipality would have no more right to complain than it would if it were a natural stream. The users of water from a natural stream would have the right to have the water of such stream, if they had appropriated it prior to the time that the village or city was laid out or established upon its borders, kept within its banks in order to give them the full benefit of their prior appropriations. The rule of law applicable to such a case would be the same whether the channel through which the water was conducted was artificial or natural." In the situation presented here we conclude, as the court did in that case, "such ordinance held invalid when applied to the ditch in question." Whether or not it would be valid in other incomparable situations we do not discuss or decide.

Counsel for plaintiff asked certain witnesses whether or not they had seen dead animals in the canal near their home. Thereto defendants objected substantially upon the ground that no time had been fixed, no foundation laid, and that the evidence was incompetent, irrelevant, immaterial, and not within the issues of the case, the question presented being whether or not the ditch itself is a nuisance as defined by the ordinance, and not whether or not it was operated as a nuisance. The objections were sustained, whereupon plaintiff offered to prove that the witnesses had observed dead animals in the canal and that the odor therefrom was offensive. Like objections were made to the offer and were severally sustained. Plaintiff, without citing any authority except section 28-1014, R. R. S. 1943, argued that the trial court erred in so ruling. We conclude otherwise.

In that connection it will be noted at the outset that no foundation was laid, and that the offer was broader than the question. Also, as stated by plaintiff in its brief: "It is significant that the court is called upon to scrutinize the exercise of legislative power, and that judicial abatement of an alleged nuisance is not sought. * * * If Scottsbluff sought the judicial abatement of an alleged nuisance, the scope of judicial inquiry would be infinitely greater." Such statements answer plaintiff's contention. We are not here considering an ordinance which provided that any irrigation canal in which dead animals or other debris is permitted to accumulate shall be a nuisance.

In Standard Oil Co. v. City of Kearney, *supra*, this court said: "It is also claimed that the noise of the honking of horns and the running of the engines would be a nuisance to the other users of the street. The noise, however, is only incidental to and not a necessary part of the proposed business. If the protection of the public from noise was the purpose sought to be attained, it would seem that it could be easily controlled by proper ordinances going directly to that subject." See, also, City of Omaha v. Hugh Murphy Construction Co., 114 Neb. 573, 208 N. W. 667; Stuhr v. City of Grand Island, 120 Neb. 491, 233 N. W. 886. Likewise, if protection of the public from dead animals or debris in the canal and laterals is a purpose sought to be obtained, the city of Scottsbluff has a like remedy, or, under proper circumstances, it may turn for relief to section 28-1014, R. R. S. 1943.

Plaintiff offered to prove by the introduction of parts of official hydrographic reports of the Department of Roads and Irrigation that defendants over a period of years had satisfied a part of their water requirements by diversions from a drainage ditch which intersects the canal after it has passed through the city. They made such offer purportedly in order to show that the water carriage capacity of defendants' canal and laterals within

the city equal to its maximum permitted appropriation or diversion was not required, thus reducing its burden of compliance with the ordinance. The trial court sustained objections thereto, and plaintiff contended that it erred in so doing, or that in any event judicial notice should have been taken of the facts disclosed thereby.

We conclude that plaintiff's contention in that regard has no merit because the facts disclosed by such evidence could not in any manner affect ultimate decision in this case. In that connection the very ordinance which plaintiff is attempting to enforce provides that such pipe or conduits should be "of sufficient size and capacity to carry or conduct into and through such pipe or conduit all of the water which may be permitted to flow through such ditch or canal."

The important point, however, is that Winters Creek Canal Company has no appropriation to divert waters from Winters Creek drainage ditch. Its appropriation is from the North Platte River. It is true that for a number of years state officials have, as a matter of grace, tolerated the taking of some water by defendant company from such drain, but concededly it has no appropriation therefrom. Whether or not it could obtain such an appropriation we are not required to discuss or decide. It is sufficient for us to cite Drainage District No. 1 v. Suburban Irrigation Dist., 139 Neb. 460, 298 N. W. 131. On the other hand, even if such waters were subject to appropriation, defendant company could not be required by plaintiff to surrender its 1888 appropriation for a different appropriation. Contrary to plaintiff's contention, the opinion in Nebraska v. Wyoming, 325 U. S. 589, 65 S. Ct. 1332, 89 L. Ed. 1815, is not controlling because it did not and obviously could not change the Constitution and statutes of this state. It simply made an "equitable apportionment between the States of the water of the North Platte River." We therefore conclude that the trial court did not err in refusing to admit or take judicial notice of such official reports.

For the reasons heretofore stated, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.