ROSS ALLEN McCREA, APPELLANT, v. ROBERT CUNNINGHAM, AS MAYOR OF THE CITY OF OMAHA, NEBRASKA, ET AL., APPELLEES.

277 N. W. 2d 52

Filed March 20, 1979. No. 41839.

David L. Herzog, for appellant.

Herbert M. Fitle and James E. Fellows, for appellees.

Heard before KRIVOSHA, C. J., McCOWN, CLINTON, and BRODKEY, JJ., and STANLEY, District Judge.

BRODKEY, J.

On January 12, 1977, Ross Allen McCrea, as plaintiff, instituted an equity action in the District Court for Douglas County, Nebraska, naming as defendants to that action the Mayor, the Public Safety Director, the Personnel Director, and the Fire Chief, all of the City of Omaha, Nebraska, praying for a permanent injunction preventing the enforcement or use of certain visual standards or requirements promulgated and in effect in connection with the employment of firemen for the City of Omaha; and also praying for a declaratory judgment with reference to the enforceability, lawfulness, constitutionality, and reasonableness of such vision requirements and regulations pertaining to the duties of a City of Omaha Fire Fighter (801); and for a decree declaring the rights, duties, and legal obligations of the parties, and for other relief.

In his petition filed in the action, plaintiff, after alleging the positions held with the City of Omaha by

the defendants, and their duties, alleges that prior to the institution of the lawsuit he had applied for employment with the City of Omaha in the position of Fire Fighter (801), pursuant to an announcement containing the description of the nature of the work, and setting forth certain requirements, including that the applicant have vision not less than 20/30, correctable to 20/20 in each eye, and have normal color perception. Plaintiff alleges that he fulfilled each of the requirements and requisite qualifications for the position and passed the various examinations required of him; that his name was put on a list of eligible candidates to be hired as a firefighter on October 11, 1976; and that he was designated as eligible appointee No. 11. Plaintiff further alleges that sometime after August 2, 1976, he was notified that his employment application for the position was rejected because of the condition of his eyesight. Plaintiff alleges his eyesight is suitable, reasonable, and proper for all the work tests required of a firefighter, that his vision is suitable and correctable for the work required of firefighters, and that he can reasonably perform all the duties and tests required. He further alleges the defendants are enforcing and utilizing against him standards or guidelines regarding vision qualifications which are arbitrary, capricious, and unreasonable, and not related to the employment work or service to be performed, and which are violative of his constitutional rights under both the Federal and Nebraska Constitutions. He alleges he possesses no adequate remedy at law; and, as previously stated, prays for injunctive relief against using the regulations in question. In his second cause of action he repeats the allegations of the first cause of action, and further alleges that the regulations pertaining to vision are void, vague, unreasonable, arbitrary, and unconstitutional and should, therefore, be declared void and unenforceable by the court by way of a declaratory judgment.

Plaintiff obtained a restraining order to be in effect until trial. The order was later modified to provide that the defendants may proceed with the selection of firefighter candidates and may fill 12 of the 14 vacancies, but the two remaining vacancies were to be held open for the plaintiff, Ross Allen McCrea, and a plaintiff in a similar action, Thomas J. Shimerdla, pending the outcome of the litigation.

The McCrea and Shimerdla cases were consolidated for trial before Judge Patrick W. Lynch; and the cases were tried pursuant to a stipulation of facts entered into between the parties and supplemented by testimony of witnesses, following which, the court took the matter under advisement, and entered orders denying the applications for injunction and dismissing plaintiffs' petitions. The court found that the vision requirements for entry level firefighter personnel were supported by competent evidence, that the minimum sight standards were not unreasonable or radically inconsistent with those for firemen in other metropolitan cities canvassed, and that they bore logical and reasonable relationship to an applicant's fitness and capacity to discharge the duties of a city firefighter. The court further found the minimum levels of fitness are and have been applied continuously and impartially to all candidates for employment with the Omaha Fire Division and no convincing evidence had been presented that there had been anything arbitrary or capricious in the adoption or application of the visual acuity standards for Omaha firemen.

Plaintiff McCrea has appealed to this court from the order of the District Court denying his injunctive relief and dismissing his petition, but it appears that Thomas J. Shimerdla, plaintiff in the other case consolidated for trial, has not appealed. Plaintiff's principal assignments of error are that the trial court erred in not finding that the vision standards enforced by the City of Omaha were capricious, ar-

bitrary, and not a reasonable or bona fide condition of employment; and also that the trial court erred in not finding an unreasonable classification existed between the standards for entry level firemen, and other firemen.

For the purpose of submitting the issues of the case to the court for determination, the parties and their attorneys entered into a stipulation as to the facts. Among the facts stipulated to were that the named defendants were the Mayor, Public Safety Director, Personnel Director, and Fire Chief of the City of Omaha and "that said persons were designated by law with the responsibility to promulgate, utilize and enforce the regulations for hiring fire fighters for employment by the City of Omaha, Nebraska." Also stipulated was that on or about August 2, 1976, the City of Omaha posted a notice for examination for the position of Fire Fighter (801), which announcement contained a description of the nature of the work and set forth the requirements for the position, including a requirement that vision be not less than 20/30 correctable to 20/20 in each eye and have normal color perception. It was further stipulated that Ross Allen McCrea did on or about August 26, 1976, make application to fill the position of Fire Fighter (801), and he was ranked No. 11 among the eligible candidates; that he fulfilled and satisfied each firefighter qualification and examination except the requirement relating to correctable vision; and that further the Personnel Director did on October 19, 1976, place his name on a Form P-20 as an eligible candidate to be hired, and he was selected for final testing and evaluation, including conformance with the minimum vision requirements required by the City of Omaha. It was further stipulated that on November 23, 1976, Ross Allen McCrea was given a health evaluation examination and was certified unqualified by Dr. Paul P. Reichstadt for unsatisfactory vision, and he was

so notified by letter from Paul L. Murphy, labor relations division, under date of November 30, 1976. It was further stipulated as of the date of the filing of the lawsuit and date of trial there was a position open and available for employment of the plaintiff as a firefighter. In addition, it was stipulated: "Vision requirements adopted by the City of Omaha for Fire Fighter are 20/30 vision in each eye, correctable to 20/20. The establishment of this minimum standard has been determined by the Personnel Department with the concurrence of the Fire Division by survey of the applicable standards utilized by other metropolitan cities in the selection and hiring of entry level fire fighters."

Attached to the stipulation are also copies of the requirements from other cities, including St. Louis, Missouri; Kansas City, Missouri; El Paso, Texas; Des Moines, Iowa; Sacramento, California; Phoenix, Arizona; Wichita, Kansas; Akron, Ohio; San Antonio, Texas; Lincoln, Nebraska; Cincinnati, Ohio; St. Paul, Minnesota; Tucson, Arizona; and Fort Worth, Texas. Also attached to the stipulation as exhibits were replies from certain cities contacted with reference to the foundation for the establishment of the applicable standards in each of such cities. Finally, it was stipulated that the National Fire Protection Association Pamphlet No. 1001, entitled "Fire Fighter Professional Qualifications" provides: " '2-2.7.2 Vision. The cause for rejection for appointment shall be: (b) Standard Visual Acuity. Standard visual acuity without correction, less than 20/40 in one eye, and 20/100 in the other eye; and with correction, less than 20/20 in one eye, and 20/40 in the other eye.' "

In addition to the facts stipulated by the attorneys, the evidence at the trial was implemented by the testimony of witnesses called by both the plaintiff and the defendants. Plaintiff called as his first witness Dr. Raymond E. Records, professor of medi-

644

cine and chairman of the ophthalmology department of the University of Nebraska Medical Center. He testified as to the meaning of 20/20 vision, stating it was regarded around the world as standard normal vision; and it provided a zero point or reference point for evaluating vision. He stated that at 20 feet a man with purportedly normal vision can resolve a letter which is 7 millimeters high. In answer to the question whether there was vision that is better than 20/20, he stated there was and that one can have vision that is 20/15, one line better than 20/20. He also testified he could find no medical literature establishing standards for firemen. He further stated the difference between vision of 20/30 and 20/20 was very small and that a man with 20/30 vision could do anything that a man with 20/20 vision could do. He was asked, based upon his acquaintanceship with the functions of a fireman and the eye standards required by the City, whether there was any rational basis with any reasonable medical certainty to restrict firefighters, as far as visual acuity, to those who have vision of 20/30 correctable to 20/20, and he replied "No." We note in passing that the record reveals the plaintiff's visual acuity test was 20/200. There is evidence in the record that prior to the establishment of the visual acuity test required of plaintiff, the standard for firemen in Omaha was set at 20/20, which was an even higher standard than the one to which plaintiff was subjected. There is also evidence in the record that in 1971 a meeting occurred between Fire Chief Van Scoy and George Miller, employment manager for the City of Omaha, in which it was determined to change the visual acuity standard from 20/20 to 20/30, correctable to 20/20, because of manpower problems and a shortage of applications for positions as firefighters. No scientific or medical studies were made to warrant the change. Evidence was also presented that face masks for use by firemen who wear glasses are

available. In an exhibit introduced by plaintiff there is a picture of face mask equipment which is shown covering a man wearing glasses; however, there is also testimony in the record indicating that particular equipment is intended for commercial use, and not for firefighting purposes. Fire Chief Van Scoy testified he was not ordering the type of face masks shown depicting an individual wearing glasses because of the way the diaphram hooks up and because the face piece is different. He was asked: "I am, therefore, asking you, Chief Van Scoy, there is equipment available for use by firefighters who wear glasses wherein a face mask can effectively fit over the face; isn't that correct? A. No, sir." Evidence was also presented to the effect that many of the firefighters for the City of Omaha do wear glasses, and are able to and do remove their glasses when fighting fires. Chief Van Scoy testified with reference to the problems arising with the use of eyeglasses by an on-the-line working firefighter, stating: "Well, one of the problems is, if you do not have good vision and you have to put the mask on that we have today, they will leak around the side where your glass frame goes back over your ear. And if they leak and you are in a contaminated area, smoke will get in there. If you get into a very toxic chemical, it could get into your facepiece and kill you."

It is to be noted in the instant case that the question of the reasonableness of the action taken by the personnel department in setting its visual acuity standards for firemen is well supported by the documentation which is part of the stipulation entered into between the parties. Of the approximately 15 cities responding to the survey conducted by the City of Omaha, it appears that every major metropolitan fire department has adopted standards of visual acuity similar to that adopted by the City of Omaha. In some cases the standards are more strict than

those adopted by Omaha; in other cases they are more lenient. We set out below a sampling of the replies received from the personnel departments and others of various cities replying to the inquiry of the City of Omaha as to the basis for establishing their visual standards for firefighters. The personnel department of the city of Cincinnati, Ohio in its reply states: "Medical standards for employees of the City of Cincinnati are established by the Civil Service Commission upon the advice of medical personnel including the Health Commissioner, the Fire Physician and the Police Physician. The present vision standards for Fire Recruit have been set at 20/40 each eye uncorrected (far point vision). * * * The Fire Division feels (and we agree) that vision standards are necessary considering that we are screening young persons in their 20's and that vision will probably deteriorate with age. The Fire Division has had no problems with retirements due to failing eyesight. It should also be remembered that fire personnel are required to drive heavy equipment under emergency conditions, as well as wear masks which may or may not permit the use of glasses." The personnel department of the city of St. Louis states in its response: "As you know from your prior survey, we require uncorrected vision measured at 20/20. We performed a thorough job study on this position prior to our last examination. Two elements were found which justified the 20/20 requirement. The first of these was brought out by members of the Fire Department. They felt that if a Firefighter were to lose his glasses or contacts during a fire that his life and that of his fellow Firefighters might be endangered. The use of glasses also affects the seal of the gas masks used by Firefighters.

"A review of the standard by our medical people brought out the fact that visual acurity [sic] tends to lessen with age. Thus, a young Firefighter hired

with affected eye sight might have a greater handicap later in his career than one with 20/20 vision." The Civil Service Commission of Akron, Ohio, replied stating that its vision requirements were established on a basis of "a study conducted by Dr. Gerald Bowling, Akron Physician, in conjunction with the Fire Division Training School," and stated: "The study determined that, due to the amount of smoke and steam generated at a fire and the consequences of a Firefighter losing or breaking glasses in high density smoke, contact lenses and/or glasses represent a substantial hazard to the individual and possibly other Firefighters who are dependent upon him. Therefore, the standard was set at 20/60, 20/40 corresponding to State Law which requires the wearing of eye glasses for operating vehicles and performing other work requiring corrective visual acquity [sic]." The personnel office of the city of St. Paul, Minnesota, also replied, enclosing a copy of a letter from a Dr. John R. Kennedy, O.D., St. Paul, Minnesota, who states that he had talked to Dr. Irvin Borish, professor of visual optics at Indiana University, and Dr. Oscar Richards, professor of optometry at Pacific University and as a result of those consultations his opinion was as follows: "The Fire Fighter must see to drive heavy equipment under most adverse conditions — rain, snow, night time. He must be able to function in smoke filled, dark room, climb stairways which may be broken, travel corridors which may have collapsed floors, and in addition, he is encumbered at times by respirator masks that reduce his vision. There is incomparable noise at times that prevents auditory signaling. If he wears glasses, these can be and have been broken or lost while doing his work, but he must still be able to perform his duties and reduce risk of loss of life or injuries to himself and others.

"It is my opinion as one who has specialized in the

field of human vision for more than twenty years that a Fire Fighter would be the least risk to his employer and himself if his visual acuity was 20/60 or better uncorrected and 20/40 or better with correction. He should have a normal field of vision, normal depth perception, and normal color vision.''

All of the foregoing letters, and others, are in evidence by virtue of the stipulation of the parties and may be considered as evidence in this matter.

In City of Scottsbluff v. Winters Creek Canal Co., 155 Neb. 723, 53 N. W. 2d 543 (1952), quoting from the case of Standard Oil Co. v. City of Kearney, 106 Neb. 558, 184 N. W. 109 (1921) we stated: '' 'In the exercise of police power delegated to a city, it is generally for the municipal authorities to determine what rules, regulations and ordinances are required for the health, comfort and safety of the people, but their action is not final and is subject to the scrutiny of the courts.'

''As stated in Union Pacific R. R. Co. v. State, 88 Neb. 247, 129 N. W. 290, quoting from In re Anderson, 69 Neb. 686, 96 N. W. 149: ' '' 'The test in such cases is whether the regulation in question is a bona fide exercise of the police power or an arbitrary and unreasonable interference with the rights of individuals under the guise of police regulation.' '' '

''A legal presumption exists in favor of validity, and unless the contrary appears upon the face of the ordinance, the burden is upon the party attacking it as invalid to show by clear and unequivocal evidence that the regulation imposed by it is so arbitrary, unreasonable, or confiscatory as to amount to depriving such party of property without due process of law. State ex rel. Andruss v. Mayor, 120 Neb. 413, 233 N. W. 4; Council Bluffs Transit Co. v. City of Omaha, 154 Neb. 717, 49 N. W. 2d 453.'' Further, in Jones v. Village of Farnam, 174 Neb. 704, 119 N. W. 2d 157 (1963), we stated: ''The acts of legislative bodies, whether state or municipal, if performed

within the prescribed limits, are not subject to revision or control by the courts on the ground of inexpediency, injustice or impropriety. Such are purely functions of legislative power. Neither will the courts take cognizance over matters involving the wisdom or necessity for the enactment of legislation. The legislative body may alone determine whether a certain piece of legislation is needed or advisable for the general government of the people from whom its power emanates. The concern of the courts is as to the limits of the power, and not the manner or method by which the power is sought to be exercised, if kept within the prescribed limits. Therefore, judicial inquiry is strictly one of power, and not of expediency. To do otherwise would amount to an unwarranted encroachment by the judicial branch of the government upon the powers of the legislative branch and thus tend to destroy the necessary coordination existing between these two separate branches. The principle was adopted by this court in Omaha & C.B. Street R. Co. v. City of Omaha, 114 Neb. 483 (208 N. W. 123); Enders v. Friday, 78 Neb. 510 (111 N. W. 140); Village of Bellevue v. Bellevue Imp. Co., 65 Neb. 52 (90 N. W. 1002)."

The standards involved in this case are directly related to the health and safety of the firemen and the public, and hence are a proper exercise of the police power of the state, and are not violative of any rights of the plaintiff under the State or Federal Constitutions. We conclude that appellant has failed to sustain his burden to establish the invalidity or unconstitutionality of the standards in question.

Two other matters require discussion. Although this action is clearly not an action brought under the Nebraska or Federal Fair Employment Practice Act, plaintiff points out that under section 48-1101, R. R. S. 1943, it is declared to be "the policy of this state to foster the employment of all employable persons in the state on the basis of merit regardless

of their race, color, religion, sex, *disability*, or national origin, and to safeguard their right to obtain and hold employment without discrimination because of their race, color, religion, sex, *disability*, or national origin." (Emphasis supplied.) He further points out that under section 48-1102 (8), R. R. S. 1943, disability is defined as "any physicial or mental condition, infirmity, malformation, or disfigurement which * * * shall include, but not be limited to * * * visual impediment * * *, and shall also mean the physical or mental condition * * * unrelated to such person's ability to engage in a particular occupation." We believe the evidence in this case clearly establishes that a visual impediment in a firefighter is not "unrelated" to such person's ability to engage in his occupation, even though his visual acuity, as such, may possibly be corrected by the wearing of glasses for ordinary purposes.

We also note that section 48-1108, R. R. S. 1943, further provides: "Notwithstanding any other provision of sections 48-1101 to 48-1125, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, * * * on the basis of his religion, sex, *disability*, or national origin in those certain instances where religion, sex, *disability*, or national origin is a bonafide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise * * *." (Emphasis supplied.) Plaintiff's contention in this regard is clearly without merit; and any discrimination, if such there be, is based upon a bona fide occupational qualification. Plaintiff also points out that section 20-126, R. R. S. 1943, provides: "It is the policy of this state to encourage and enable the blind, the *visually handicapped*, and the otherwise physically disabled to participate fully in the social and economic life of the state and to engage in remunerative employment." (Emphasis supplied.) We note, however, that section 20-131, R. R. S. 1943,

provides: "It is the policy of this state that the blind, the *visually handicapped*, and the otherwise physically disabled shall be employed by the state, the political subdivisions of the state, the public schools, and all other employment supported in whole or in part by public funds on the same terms and conditions as the able bodied, *unless it is shown that the particular disability prevents the performance of the work involved.*" (Emphasis supplied.) The nonapplicability of the above section is clearly evident, as the evidence supports the conclusion in this case that the particular disability does prevent the performance of the work involved.

In Maxwell v. Civil Service Commission of City and County of San Francisco, 169 Cal. 336, 146 P. 869 (1915), a case which has been repeatedly cited and affirmed since its issuance, the court had before it the San Francisco Charter providing for a classified civil service and declaring that all places of employment in the department shall constitute the classified service, and that applicants for places therein shall be subjected to examination which shall include "appropriate" tests of physical qualifications. The court held that the commission holding an examination for promotion in the fire department from the rank of battalion chief to the rank of assistant chief engineer could dispense with the physical tests, and the court would not interfere with its discretion. The language of the court in that case is interesting and persuasive: "While it cannot be denied that physical fitness and health are prime requisites for a fireman, whatever his work in the service, it does not follow that in all examinations, those to determine the fitness of applicants for promotion, as well as those having for their object the selection of eligible men for entry into the department, there should be included tests of physical qualifications and health. Section 4 of article 13, quoted above, does not require physical tests in all

cases or even in any specifically defined cases. Such tests are to be included 'when appropriate.' It would seem that, under this language, the decision whether physical tests are appropriate is committed to the civil service commission, and that it is difficult to say, in any particular case, that the appropriateness is so clear and obvious that a court would be justified in controlling the determination of the board. * * * Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. They may decide a particular question wrong — but it is their question. Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.''

We conclude from an examination of the evidence in this case and the applicable law, that the trial court was correct in denying plaintiff's application for an injunction, and in dismissing plaintiff's petition in this action. We affirm the judgment of the District Court.

AFFIRMED.